**UNITED STATES of America, Appellee,**

v.

**Gerald CONNELL, Defendant, Appellant.**

**No. 91–1700.**

United States Court of Appeals, First Circuit.

Heard Jan. 7, 1992.

Decided Feb. 26, 1992.

William A. Dimitri, Jr., with whom Dimitri & Dimitri was on brief, for defendant, appellant.

Margaret E. Curran, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., and Craig N. Moore, Asst. U.S. Atty., were on brief, for the U.S.

Before TORRUELLA, ALDRICH and SELYA, Circuit Judges.

SELYA, Circuit Judge.

This appeal, in which the appellant complains that the government practiced "sentencing entrapment," calls upon us to venture onto *terra incognita*. Believing, as we do, that the district court did not err in accepting the fruits of the government's activities, we turn a deaf ear to the appellant's complaint. We also overrule his objection to a "special skill" adjustment made by the lower court in constructing the guideline sentencing range (GSR). Withal, an intervening change in the law leads us to remand the matter for reconsideration of the sentence originally imposed.

## I. BACKGROUND

Defendant-appellant Gerald Connell pled guilty to a single count charging that he structured financial transactions for the purpose of evading federal currency reporting requirements in violation of 31 U.S.C. § 5324 (1988). The trial judge fixed the GSR at twenty-seven/thirty-three months (offense level 18/criminal history category I) and, on June 26, 1991, sentenced Connell to a thirty month prison term.[1] Because the conviction stemmed from a guilty plea, we draw the facts from the transcript of the sentencing hearing and the presentence

---

1. The judge also imposed a two year term of supervised release, fined Connell $15,000, made the $50 special felony assessment, and ordered Connell to pay the costs of his confinement.

investigation report (PSI Report). *See United States v. Garcia*, 954 F.2d 12, 14 (1st Cir.1992).

The appellant was a stockbroker with the firm of Barrett & Company, Middletown, Rhode Island. In the spring of 1989, a Newport-area attorney introduced him to "Bill Ross." Although Ross held himself out to be a financial consultant and "front man" for anonymous persons desirous of laundering money, he was a counterfeit bill. In reality, Ross was an agent of the Internal Revenue Service (IRS), bent on investigating money laundering activities in Rhode Island. After a series of preliminary meetings, Connell began to launder money at Ross's behest.

The scheme worked this way. Connell opened a series of bank accounts in his own name at various banking institutions and established a money market account (the MMA) in Ross's name at Barrett & Company. Knowing that federal law required financial institutions to file currency transaction reports (CTRs) with the IRS for all cash transactions in excess of $10,000, *see* 31 C.F.R. § 103.22 (1990), Connell took cash from Ross, divided it into increments of less than $10,000, and spread the smaller increments among the bank accounts that he had opened. Connell eventually withdrew the money from the accounts, again in amounts under $10,000, and deposited the funds into the MMA. He also purchased stock in his own name, for Ross's benefit. No CTRs were filed for any of these myriad money shuffles.

Appellant did Ross's bidding on four separate occasions. He accepted $16,000 in cash on June 21, 1989; $25,000 on June 29; $15,000 on July 20; and, finally, $25,000 on March 21, 1990. Appellant's motivation seems to have been the gossamer prospect of playing a part in future business deals involving Ross and Ross's principals. In any event, he declined Ross's offer of a set fee for services rendered.

Throughout his conversations with Ross, Connell indicated an awareness that structuring cash transactions to avoid filing CTRs was a violation of federal law.[2] Connell was not, however, aggressively inquisitive as to the origin of the funds. During their first meeting, Ross told Connell that the money was coming from an elaborate gambling operation in Atlantic City (whether legal or illegal, Ross did not specify). On three occasions in early 1990, Ross told Connell that he was laundering money derived from the illegal drug trade. All the relevant conversations were tape-recorded.

## II. CRIMINALLY DERIVED PROPERTY

Appellant's first assignment of error involves the district court's decision to adjust the offense level upward under U.S.S.G. § 2S1.3(b)(1) (calling for a five-level increase in cases where "the defendant knew or believed that [laundered] funds were criminally derived property").[3] Notwithstanding the apparent fit between the guideline and the circumstances of the case, appellant argues that the sentencing court should not have applied the five-level enhancement because of the way in which the drug trafficking motif was interjected into the money laundering scheme. We review the sentencing court's factbound determinations in respect to U.S.S.G. § 2S1.3 only for clear error. *See United States v. Kotoch*, 954 F.2d 340, 341 (6th Cir.1992); *United States v. Hassan*, 927 F.2d 303, 309 (7th Cir.1991); *United States v. Ortiz Barrera*, 922 F.2d 664, 666 (11th Cir.1991) (per curiam).

---

2. The appellant concedes that his brokerage firm and the banks in question were all "financial institutions" within the sweep of the money laundering statutes. *See* 31 U.S.C. § 5312(a)(2) (1988) (defining "financial institution"); *see also* 31 C.F.R. § 103.11(i) (1990) (implementing statute). The appellant also concedes that his activity on Ross's behalf constituted transactional structuring of the kind proscribed by 31 U.S.C. § 5324.

3. Except where otherwise specifically indicated, all references to the sentencing guidelines are to the guidelines as they stood on June 26, 1991. *See United States v. Harotunian*, 920 F.2d 1040, 1041–42 (1st Cir.1990) ("Barring any *ex post facto* problem, a defendant is to be punished according to the guidelines in effect at the time of sentencing.") (citing 18 U.S.C. § 3553(a)(4)).

### A.

Appellant does not contest the legitimacy of the sting operation per se. Rather, his opposition to the five-level enhancement is built upon the claim that Ross gratuitously spun a yarn about the illicit origin of the funds for the sole purpose of guaranteeing that appellant's punishment would be increased. The appellant describes this conduct as "sentencing entrapment." In the relatively brief period since the advent of the federal sentencing guidelines, we have not had the occasion to analyze a comparable claim.[4]

To be sure, appellant acknowledges that government-supplied funds, produced in the course of a sting operation, can trigger the five-level enhancement. *See* U.S.S.G. § 2S1.3, comment. (n.2). But in this case, he contends that the vice lay in the timing: by broaching the subject of the currency's supposed origin (drug trafficking) only after Connell had fully completed three episodes of money laundering, the undercover agent forced (or lured) him into actions he would otherwise have eschewed, i.e., peripheral participation in the narcotics trade. This Machiavellian scenario, Connell adds, was orchestrated for the sole purpose of boosting the sentence he would ultimately receive. In mounting this attack, appellant relies heavily upon two cases which, while affirming sentences imposed by district judges, mention in dicta that a creature such as "sentencing entrapment" might be roaming loose in the guidelines jungle and, under certain unspecified circumstances, might warrant a downward departure from the GSR. *See United States v. Lenfesty*, 923 F.2d 1293, 1300 (8th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 1602, 113 L.Ed.2d 665 (1991); *United States v. Stuart*, 923 F.2d 607, 614 (8th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 1599, 113 L.Ed.2d 662 —— U.S. ——, 112 S.Ct. 145, 116 L.Ed.2d 111 (1991).

As a preliminary matter, we prefer to dismiss the inexact, albeit catchy, label that Connell uses. By his guilty plea, appellant freely admitted that he was predisposed to structure cash transactions. Hence, there was no basis for an entrapment defense on the merits. *See United States v. Rodriguez*, 858 F.2d 809, 812 (1st Cir.1988) (defendant must make a showing of lack of predisposition in order to prevail on an entrapment defense). While it is problematic whether the appellant was predisposed to do business with drug dealers, his predisposition to engage in illegal currency transactions makes the use of the term "sentencing entrapment" both inapposite and misleading. His complaint, at bottom, is that the government practiced what might more accurately be called "sentencing factor manipulation."

■ By definition, there is an element of manipulation in any sting operation. The question presented here presupposes as much. It requires us to consider whether the manipulation inherent in a sting operation, even if insufficiently oppressive to support an entrapment defense, *see, e.g., Rodriguez*, 858 F.2d at 812–15 (outlining elements of entrapment defense), or due process claim, *see, e.g., United States v. Panitz*, 907 F.2d 1267, 1272–73 (1st Cir. 1990) (outlining theoretical underpinnings of premise that government's active participation in a criminal venture may go so far as to offend due process), must sometimes be filtered out of the sentencing calculus. So framed, the question brings to mind much that has been written and stated about the opportunities that the sentencing guidelines pose for prosecutors to gerrymander the district courts' sentencing options and thus, defendants' sentences. *See, e.g.*, G. Heaney, *The Reality of Guidelines Sentencing*, 28 Am.Crim.L.Rev. 161, 195–96 (1991); S. Glickman & S. Salky, *Criminal Defense in the Era of Sentencing Guidelines*, 150 P.L.I.Crim. 807 (1989). It is unsurprising, therefore, that challenges to the manipulative powers available to prosecutors and investigators under the sentencing guidelines have arisen in a rich variety of situations. *See, e.g., United*

---

**4.** In *United States v. Castiello*, 915 F.2d 1 (1st Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 787, 112 L.Ed.2d 849 (1991), we declined to address an analogous remonstrance due to the lack of an adequate evidentiary predicate. *See id.* at 5 n. 10.

*States v. Richardson,* 925 F.2d 112 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2868, 115 L.Ed.2d 1034 (1991);[5] *United States v. Dickey,* 924 F.2d 836 (9th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 383, 116 L.Ed.2d 334 (1991);[6] *Lenfesty, supra,* 923 F.2d 1293; *Stuart, supra,* 923 F.2d 607.

At first blush, this case seems to present the problem in bold relief. But on close perscrutation of the record, appellant's argument, whatever its theoretical possibilities may portend for other cases, falters on an inadequate factual foundation. Assuming, arguendo, that prior to February of 1990, Connell did not know the funds were criminally derived,[7] there is no doubt that he was clearly on notice thereafter. On February 28, 1990, Ross told Connell that he was "going to have cash coming in ... [that] is not very clean money. It's narcotics money." Connell inquired as to the wellspring of Ross's knowledge. Ross replied that his boss had mistakenly given him a valise containing "the pure white stuff." On March 7, 1990, Ross requested that appellant transfer some funds for him by wire. During this conversation, Ross mentioned that the funds were "payment for some narcotic[s]." Two weeks later, during a desultory discussion, Ross described his principals' business as "100% narcotics." These conversations, all of which were tape-recorded and all of which occurred prior to the final episode of money laundering, provided a sturdy predicate for the section 2S1.3(b)(1) enhancement. The only remaining question is whether the circumstances surrounding Ross's interweaving of narcotics into the fabric of an ongoing crime in some way constituted a mitigating factor for sentencing purposes. The district court thought not. We agree.

Appellant asserts that by the time the specter of drug profits surfaced, he was too far into the money laundering scheme to extricate himself, notwithstanding his aversion to facilitating the drug trade. Appellant also asserts that his newfound knowledge placed him in harm's way should he refuse to continue with the scheme. But, these assertions mix conjecture with fact. We reject them for several reasons, citing two.

*First,* nothing in this record suggests that Ross lured appellant into committing a lesser crime, only to exploit his vulnerability at a later date. To the contrary, dating back to appellant's earliest contact with Ross, the record is barren of any whisper of a hint of an intimation that appellant cared in the least about the breed of Ross's cash cow—and common sense counsels that, if the funds were not tainted, the need for appellant's services would never have arisen. One does not normally launder either clean clothes or clean money. In fine, the nature of the ongoing criminal activity was not materially altered by Ross's reve-

---

5. *Richardson* involved defendants who pled guilty to money laundering crimes in the context of a sting operation. The defendants argued that "the power of the executive branch to determine a defendant's sentence based on the amount of money that undercover agents bring to the table in a 'sting' operation violates the separation of powers doctrine." *Richardson,* 925 F.2d at 117. The court disagreed, pointing out that the judiciary retained the authority to determine that the larger sum was not part of the laundering operation, hence, excludable from the offender's "relevant conduct." *Id.*

6. In *Dickey,* the defendant argued for a downward departure on the ground of "imperfect entrapment," asserting that a government agent had "talked him into" printing counterfeit money. *Dickey,* 924 F.2d at 839. The court concluded that, because the defendant's conviction was the result of a guilty plea, there was "'no warrant for the argument that governmental ...

misconduct should mitigate the sentence of an admittedly guilty defendant.'" *Id.* at 839 (quoting *United States v. Streeter,* 907 F.2d 781, 787 (8th Cir.1990)).

7. According to the PSI Report, the circumstances of appellant's dealings with Ross may well have led him to believe that the funds were criminally derived long before any overt confirmation transpired. An enhancement under U.S.S.G. § 2S1.3(b)(1) is appropriate, however, only when the defendant knew, or actually believed, that the funds had an illegal origin, not when defendant, short of actual knowledge, "reasonably should have believed" in their illicit origin. U.S.S.G. § 2S1.3(a)(1)(C). Because the sentencing court did not make a specific finding that appellant actually knew, prior to February 1990, that the money flowed from an illegal source, we train our sights on the interval between the third and fourth episodes.

lations. The court below was, therefore, entitled to conclude that laundering drug money came within the encincture of appellant's original decision to abandon the straight and narrow.

*Second,* whether Connell found the prospect of doing business with drug dealers distasteful is not the issue. The subject of narcotics was explicitly broached almost a month before the last money laundering episode occurred and was discussed on three occasions prior to the delivery of the final cash installment. Ross did not embellish his announcement of the money's source with any sort of threat. There is absolutely no indication that Ross coerced Connell in any way or tempted him with promises of greater rewards. Similarly, there is no indication that Connell was more at risk midstream than was the case at the outset of the venture.

We need not paint the lily. Appellant was given ample time and opportunity to ponder his newly acquired knowledge and, should he so elect, bow out of the scheme. The facts clearly show that he made a different choice: to carry out the March 1990 assignment with full awareness that he was handling drug money. For aught that appears, appellant continued to participate in money laundering to the bitter end for the same reason that he participated originally—his hope that Ross (and Ross's principals) would some day steer legitimate business his way. On the facts of this case, the sentencing court's decision to apply the five-level enhancement was not clearly erroneous.

### B.

Although we find no grounds for concern in the circumstances at bar, we think it advisable to reflect upon the ramifications of Connell's basic premise. It cannot be gainsaid that the sentencing guidelines, by their very nature, may afford the opportunity for sentencing factor manipulation, particularly in sting operations. We can foresee situations in which exploitative manipulation of sentencing factors by government agents might overbear the will of a person predisposed only to committing a lesser crime. This danger seems especially great in cases where the accused's sentence depends in large part on the quantity of drugs or money involved. There is, however, another side to the story. By their nature, sting operations are designed to tempt the criminally inclined, and a well-constructed sting is often sculpted to test the limits of the target's criminal inclinations. Courts should go very slowly before staking out rules that will deter government agents from the proper performance of their investigative duties.

■ While noting the existence of this inevitable tension, we make no effort today to chart the line between permissible and impermissible conduct on the part of government agents insofar as that conduct may have an impact upon the district court's sentencing options. We are confident that, should a sufficiently egregious case appear, the sentencing court has ample power to deal with the situation either by excluding the tainted transaction from the computation of relevant conduct or by departing from the GSR.[8] *See Lenfesty,* 923 F.2d at 1300 (acknowledging that governmental conduct designed unfairly to manipulate a defendant's sentence length may be grounds for downward departure); *Stuart,* 923 F.2d at 614 (same); *United States v. Medina,* 1990 WL 106785, screen *2 (S.D.N.Y.1990) (departing downward because actions of government's confidential informant amounted to coercion); *cf. United States v. Castiello,* 915 F.2d 1, 5 n. 10 (1st Cir.1990) (rejecting downward departure where defendant claimed, yet could not prove, that an undercover agent had offered to sell him cocaine at a low price

---

**8.** In *United States v. Valencia–Lucena,* 925 F.2d 506 (1st Cir.1991), we ruled that a downward departure could not be employed as a means of reprimanding the government for the "false testimony" of a government agent before a grand jury. *Id.* at 515. Governmental misconduct that shapes the contours of the crime and thus delimits the available sentencing options, however, is a considerably different matter and can, in a suitable case, furnish a basis for downward departure.

solely to increase the quantity purchased and thus increase the sentencing range, but styling defendant's argument as "intriguing"), *cert. denied*, —— U.S. ——, 111 S.Ct. 787, 112 L.Ed.2d 849 (1991).[9]

### C.

■ We end our discussion of criminally derived property by remarking a change in the sentencing guidelines. On the date appellant was sentenced, U.S.S.G. § 2S1.3(b)(1) provided for a five-level increase where criminally derived funds were knowingly laundered. This guideline was subsequently revised to provide for a four-, rather than five-, level increase. *See* U.S.S.G. App. C, amendment 379 (Nov. 1, 1991). The guidelines provide that "[w]here a defendant is serving a term of imprisonment, and the guideline range applicable to that defendant has subsequently been lowered as a result of [a specifically referenced] amendment ..., a reduction in the defendant's term of imprisonment may be considered." U.S.S.G. § 1B1.10(a), p.s. (1991). *See generally United States v. Havener*, 905 F.2d 3, 5 (1st Cir.1990) (discussing retroactivity of guideline amendments). The amendment to section 2S1.3(b)(1) is one of the amendments to which section 1B1.10(a) applies. *See* U.S.S.G. § 1B1.10(d), p.s. (1991). Hence, while Connell is not necessarily entitled to a reduction in the offense level—section 1B1.10(a) does not mandate the use of the lesser enhancement, but merely affords the sentencing court discretion to utilize it—he is entitled to have his sentence reviewed in light of the amendment.

■ When, after a defendant has been sentenced, a guideline amendment occurs under circumstances in which the defendant becomes eligible for, but not automatically entitled to, a reduced sentence, we think it is preferable that the matter of sentence reduction be considered in the first instance by the sentencing court, not by an appellate court. Accordingly, the case should be remanded to the district judge so that he may determine whether or not to adjust Connell's sentence in light of the changed guideline.[10]

### III. USE OF SPECIAL SKILL

■ Appellant's second assignment of error implicates U.S.S.G. § 3B1.3. The guidelines authorize a two-level enhancement if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." *Id.* The prosecution has the burden of proving, by a fair preponderance of the evidence, that section 3B1.3 applies in a given situation. *See United States v. Sklar*, 920 F.2d 107, 112 (1st Cir.1990) ("the government must prove facts central to increasing a defendant's offense level by a preponderance of the evidence"); *United States v. Bradley*, 917 F.2d 601, 605 (1st Cir.1990) (similar). In the case at hand, the lower court decided that the prosecution had carried the devoir of persuasion twice over, finding that appellant had both abused a position of private trust and employed a special skill in order significantly to facilitate his crime. We determine the legal meaning of the term "special skill" de novo. *United States v. Hubbard*, 929 F.2d

---

9. Some courts, faced with similar claims about governmental misconduct as a potential mitigating factor at sentencing, have said that a defendant's right to advance such a claim should be contingent upon standing trial. *See, e.g., Dickey*, 924 F.2d at 839 (where defendant pleads guilty, governmental misconduct cannot mitigate the sentence); *United States v. Streeter*, 907 F.2d 781, 787 (8th Cir.1990) (same). We do not entirely agree. In instances in which sentencing factor manipulation, as we have defined it, overbears the will of a defendant predisposed only to committing a less serious crime, we see

no reason why the defendant should be forced to undergo the rigors of trial simply to preserve his ability to challenge the government's conduct at sentencing.

10. To be sure, a defendant must ordinarily petition the district court for modification of his sentence under U.S.S.G. § 1B1.10. *See, e.g., United States v. Miller*, 903 F.2d 341, 349 (5th Cir.1990). In the present posture of this case, however, we see no need to force appellant to take this additional step.

307, 310 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 206, 309, 116 L.Ed.2d 165 (1991). Thereafter, since the district court's application of section 3B1.3 to a given set of circumstances is likely to involve drawing sophisticated inferences from a web of interconnecting facts, we review the district court's findings only for clear error. *See United States v. Rehal,* 940 F.2d 1, 5 (1st Cir.1991); *United States v. Ehrlich,* 902 F.2d 327, 330 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 788, 112 L.Ed.2d 851 (1991).

We begin, and end, by addressing the special skill issue.[11] We must ask two questions: Did appellant possess a special skill within the purview of the guidelines? If so, did appellant use that skill in order significantly to facilitate the commission or concealment of his crime? The court below answered both of these queries in the affirmative. We find no fault with the court's answers.

### A.

■ The application notes define a special skill as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S.S.G. § 3B1.3, comment. (n.2). As examples of individuals who possess special skills, the application notes list "pilots, lawyers, doctors, accountants, chemists, and demolition experts." *Id.* In this instance, the appellant is a registered stockbroker. As such, he has undergone specialized training. He has met certain licensing requirements. His field of endeavor (the securities industry) is subject to stringent regulation. We hold that the specialized knowledge required of a stockbroker, when combined with the ability to access financial markets directly, can qualify as a special skill within the meaning of U.S.S.G. § 3B1.3. *Accord United States v.*

*Astorri,* 923 F.2d 1052, 1054 (3d Cir.1991) (special skill enhancement applied to stockbroker).

Thus, the issue reduces to whether the special skill that Connell possessed "significantly facilitated the commission or concealment" of his crime. U.S.S.G. § 3B1.3. The question is not free from doubt. On the one hand, the money laundering system that Connell used was relatively straightforward. The opening of multiple bank accounts, the division of the initial sums into smaller increments, and their subsequent deposit into the accounts required no special skill. And, while a person who was not a stockbroker would have needed a stockbroker (or a banker) to open a money market account, this feat could have been accomplished by a layman without undue difficulty and without arousing any suspicion. Standing alone, such activity would not justify a section 3B1.3 enhancement. *See, e.g., United States v. Young,* 932 F.2d 1510, 1513 (D.C.Cir.1991) ("§ 3B1.3 enhancement applies only if the defendant employed a 'special skill' in the form of a pre-existing, legitimate skill not possessed by the general public to facilitate the commission or concealment of a crime.").

■ Appellant's ability to make and process deposits to the MMA without having to explain the origin of the funds to a third party is a horse of another hue. In a matter of months, Connell laundered $81,-000 through the MMA. We think this to be a substantial enough sum that any third party would have been curious as to its source. Because Connell was able to process these transactions himself, he was able to avoid inquiring eyes and embarrassing questions, thereby substantially lessening the chance that he would be caught. He was also able to buy stock in a way that shielded the identity of the true owner. We doubt that a layman could have done as

---

**11.** Since Connell used a special skill to conceal his crime within the meaning of U.S.S.G. § 3B1.3, *see infra,* we need not consider the lower's court's alternative finding that the two-level increase was also justified because Connell abused a position of private trust. *See Bradley,* 917 F.2d at 604 ("when correction of a finding would not change the applicable offense level or affect the sentencing range, any error therein would necessarily be harmless").

much, as effectively. In the last analysis, the availability of a section 3B1.3 enhancement requires only that the use of the defendant's special skill has "significantly facilitated the commission or concealment of the offense"; it does not require a showing that, but for the use of a special skill, the defendant would have been unable to perpetrate the crime. On balance, we conclude that Connell's special skill was sufficiently facilitative to support an upward adjustment. *See id.* (facilitative conduct occurs whenever defendant's special skill makes it significantly easier to conceal the offense of conviction); *cf. United States v. Pascucci,* 943 F.2d 1032, 1037 (9th Cir.1991) (use of federal marshal's identification and contacts to procure information utilized in commission of crime is use of special skill).[12]

### B.

■ Finding that appellant possessed a special skill and used it to conceal his crime does not end our inquiry. The guideline specifically provides that the special skill "adjustment may not be employed if … [the] skill is included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3. In such a situation, enhancing the defendant's sentence would constitute impermissible double counting. Because it is crystal clear that the special skill possessed by stockbrokers, as a class, was not factored into the base offense level for the crime of conviction, our focus centers on the specific offense characteristics.

The essence of illegally structuring monetary transactions is the defendant's ability to convert large sums of cash into smaller sums, thereafter passing the smaller sums through a bank account or investment medium in a way that avoids the need for filing CTRs. In its simplest form, the crime does not demand any detailed or specialized knowledge of financial markets or banking practices. Appellant's use of his skill as a stockbroker to conceal his crime was not a necessary concomitant to the commission of the offense; it merely made matters easier (and less risky) for him. It was, a fortiori, not a specific offense characteristic within the meaning of the sentencing guidelines. *See United States v. Fuente–Kolbenschlag,* 878 F.2d 1377, 1380 (11th Cir.1989) (per curiam) (printer's special skill is not a specific offense characteristic of counterfeiting).

For these reasons, we decline to disturb the district court's assessment of a two-level enhancement under U.S.S.G. § 3B1.3.

### IV. CONCLUSION

We need go no further. The adjustments which the district court made in constructing the GSR were carefully conceived. We cannot say that any of those adjustments were clearly erroneous. We therefore affirm the judgment below but remand to allow the sentencing court to consider whether the appellant's sentence should be reduced in light of the intervening amendment to the guidelines. *See supra* Part II(C).

*Affirmed and remanded.*

---

12. Appellant's flagship case, *United States v. Barone,* 913 F.2d 46 (2d Cir.1990), did not involve U.S.S.G. § 3B1.3 at all. Rather, *Barone* dealt with the entirely different question of whether the defendant's profession (as a lawyer) and public office (as a judge) warranted an upward departure under U.S.S.G. § 5K2.0, notwithstanding that the defendant had not "used his public office or his legal training to facilitate the crimes [of which he was convicted]." *Id.* at 51; *see also id.* at 52–53 (Feinberg, J., writing separately). *Barone,* therefore, does not aid appellant's cause.