**UNITED STATES of America, Appellant,**

v.

**Arnold I. FRIEDMAN, Defendant, Appellee.**

No. 97–2100.

United States Court of Appeals, First Circuit.

Heard March 3, 1998.

Decided May 5, 1998.

Christopher Alberto, Assistant U.S. Attorney, with whom Donald K. Stern, U.S. Attorney, was on brief, for appellant.

Robert L. Sheketoff, with whom Sheketoff & Homan were on brief, for appellee.

Jonathon D. Friedmann, with whom Gustavo A. del Puerto and Gargill, Sassoon & Rudolph, LLP were on brief, for amicus curiae Unisource Worldwide, Inc.

Before LYNCH, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

LYNCH, Circuit Judge.

Arnold I. Friedman was convicted of defrauding several federally insured banks and ordered at sentencing to pay restitution to the Federal Deposit Insurance Corporation (FDIC), the victim of his offenses. Before sentencing, the district court granted the government's ex parte order to seize the net proceeds of the sale of his family's oceanfront condominium to satisfy any court-imposed penalties. The government appeals an order by the district court allowing Unisource Worldwide, Inc. (Unisource), a creditor of defendant's business who had a guarantee from defendant's wife backed up by her interest in the condominium, to be paid from proceeds of the sale, as the holder of an interest in the nature of an equitable lien against the condominium.

The government argues that this decision exceeded the district court's authority under the Victim Witness Protection Act (VWPA), 18 U.S.C. §§ 3663–64, because Unisource was not the victim of defendant's offenses. The government also argues that affirming the judge's order would risk transforming sentencing proceedings into equitable bankruptcy-style proceedings, thus frustrating Congress' basic intent to provide restitution for victims. The government's concerns, if they were actually raised by the facts of this case, would present difficult questions under the VWPA.

We believe that, given the particular facts of this case, affirming the district court's order does not present the dangers the government fears because we do not agree that the district court's order releasing funds to Unisource was an order of "restitution" to Unisource under the VWPA. Rather, we regard the order as an implementation, permissible given the particular circumstances, of the district court's earlier orders affecting defendant's property. We affirm.

## I.

On October 8, 1996, Arnold I. Friedman pled guilty to charges of bank fraud in violation of 18 U.S.C. § 1344 and of making false statements in violation of 18 U.S.C. § 1014. The charges stemmed from check-kiting schemes in which Friedman defrauded several federally insured banks. The government, seeking to ensure that Friedman's assets would be available to satisfy any court-imposed penalties, filed an ex parte motion under Fed. R.Crim. Pro. 45(d) requesting an order pursuant to the All Writs Act, 28 U.S.C. § 1651, that would temporarily restrain Friedman from transferring any assets. On March 14, 1997, the district court issued this order, requiring Friedman "to cease all transfers of assets and funds" and directing that "institutions and individuals who hold any assets or funds in which Arnold I. Friedman holds an ownership interest shall not transfer any such fund or assets until further order of this Court."

One asset that belonged to members of the Friedman family at this time was a condominium located in Swamscott, Massachusetts. The owner of the condominium was the Cupid Ocean Front Realty Trust; the trustee was Kim Friedman, Arnold Friedman's adult daughter, and the sole beneficiary was Leslie Friedman, Arnold Friedman's wife. At the time of the court's March order, the condominium had been appraised at approximately $609,000. On paper, Arnold Friedman had no interest in the trust or the condominium. However, the government contended that Friedman in fact controlled the asset and that it should be attributed to him, noting that he had lived in the condominium since its purchase in 1993 and that he listed the condominium as an asset belonging to him in a February 1997 mortgage application. Arnold Friedman acknowledges that, although his position was that the condominium belonged to his wife through a valid real estate trust, a court might conclude that he controlled the condominium.

Friedman had disclosed the existence of the condominium and the trust to the government at a presentence interview. Friedman's lawyer advised him that, because the district court's March order only covered assets in which he had an ownership interest, the family was free to put the condominium up for sale. The condominium was listed with a broker. After a few months, the family received an offer of approximately $950,000 for the condominium. The closing date was June 26, 1997.

According to Friedman's lawyer, after the government learned of the impending sale of the condominium, there was a meeting between Arnold Friedman, his lawyer and officials of the Probation Department and the United States Attorney's Bank Fraud Task Force. At that meeting, Friedman's lawyer claimed, the government agreed to permit the sale of the condominium as long as $250,000 from the proceeds of the sale were put in escrow to be available at sentencing if the court ruled that the condominium belonged to Arnold Friedman. The government disputes that such an agreement ever existed, but does not dispute that such a meeting took place.

In any event, the government never sought to stop the sale of the condominium on the ground that the sale would violate the court's March order. Rather, on June 25, 1997, the day before closing, the government requested an ex parte order, again pursuant to the All Writs Act, 28 U.S.C. § 1651, directing the United States Marshals to seize the *net* proceeds of the sale. Friedman contends that the government's action in seeking the order violated the earlier agreement, and suggests that the order was sought by a different set of government attorneys *than* those that were present at the meeting. The court granted the ex parte order.

The order required "all proceeds, (after all secured claims, liens and other costs associated with the real estate closing are paid) generated by the ... sale of the condomini-

um ... [to] be turned over to the United States Marshals Service...." The order also directed the U.S. Marshals to hold the funds "until further order of the Court...."

Pursuant to this order, the following day the U.S. Marshals seized the proceeds of the sale of the condominium at the closing. The U.S. Marshals obtained a check for $342,899, which represented the sale price of the condominium ($954,617), less the amount of a mortgage loan ($445,935), another loan ($125,687), settlement costs, including attorney's fees, title insurance, broker's commission, etc. ($31,421), and taxes and utility fees to the Town of Swamscott ($8950).

As a result of the seizure, one creditor was not paid who had expected to be paid from the proceeds of the sale. That creditor, Unisource, was a supplier of Aim Chemical Enterprises, a business which Arnold and Leslie Friedman owned and operated jointly. Under a credit arrangement with Unisource, Leslie Friedman had issued a personal guarantee of Aim Chemical's debts to Unisource, a guarantee that specifically included the condominium. Aim Chemical had difficulty paying its bills, and Aim Chemical and Unisource worked out a payment plan. In early 1997, Aim Chemical defaulted on this payment plan, and Unisource indicated that it would take legal action to collect.

At that time, Leslie Friedman asked Unisource not to attach the Swamscott property through formal legal proceedings because she believed it would have a chilling effect on the impending sale. Unisource agreed to forbear from filing a formal attachment, but only after receiving Leslie Friedman's written guarantee, through her attorney, that it would be paid "[f]rom the proceeds of the sale of the property" an amount "equal to any amounts due and owing [*sic*] and outstanding for more than thirty (30) days prior to the closing date...." The agreement stated that, "[s]imultaneously with the closing," this amount would be delivered to Unisource in a check.[1] That amount, $85,773,

---

1. The agreement, dated April 3, 1997, was submitted to the district court as an addendum to Unisource's "Motion to Intervene for a Limited Purpose," described below. Unisource's motion does not appear on the district court's docket

sheet. The parties agreed to provide a copy of the motion and the April agreement to this court, and the U.S. Attorney's Office, with the defendant's consent, has submitted a letter containing the agreement to this court. We regard these

was not paid to Unisource at the closing, as Unisource and Mrs. Friedman had agreed, and those funds were instead seized by the U.S. Marshals.

The day after closing, June 27, 1997, Unisource filed a pleading styled "Motion of Unisource Worldwide, Inc. to Intervene for a Limited Purpose," purportedly pursuant to Fed.R.Civ.P. 24(a)(2). The motion requested that the district court "permit[ ] Unisource to be paid from the proceeds of the sale as if it had perfected its lien," arguing that its forbearance had benefitted all parties, including the government, by facilitating a sale that might have been discouraged if Unisource had sought to attach the condominium through formal legal proceedings. Unisource argued that its interest was sufficiently definite to come within the terms of the district court's June order directing that all "secured claims, liens and other costs associated with the real estate closing" should be paid from the proceeds of the sale prior to the seizure by the U.S. Marshals of the balance.

At a sentencing hearing on July 30, 1997, the district court heard arguments on the condominium issue. The defendant argued that the property belonged to his wife, as beneficiary of the real estate trust, although he acknowledged that his control of that asset rendered the issue close. The defendant also urged the court to permit Unisource to be paid, arguing that it was necessary for Aim Chemical's continued viability that its creditors be paid and that Aim Chemical's continued profitability would ensure his ability to pay the district court's restitution order.

The government argued that the condominium did belong to Friedman. The government also argued that Unisource was an unsecured creditor, and that its interest was therefore not covered by the June order. Finally, the government argued that the district court could not release any funds to Unisource because it was not a victim of the defendant's crimes, and that the district court lacked authority under the VWPA to do anything but order restitution to the victim.

Although the district court never acted on Unisource's motion to intervene, it permitted counsel for Unisource to address the court during the sentencing hearing. Unisource argued that its interest in the proceeds of the sale under the letter agreement was protected by the district court's June order, and that it should be paid from the proceeds as the holder of an equitable lien to remedy the improper seizure of its share.

The district court accepted this argument. It ordered restitution to the FDIC in the amount of $1,000,000, and further directed in its amended criminal judgment that "monies seized by the government will be released to probation officer to be distributed to creditor Unisource (not the victim of the instant offense) and victim FDIC." The government filed numerous motions seeking reconsideration of the order permitting Unisource to be paid, each of which was denied.

The government then filed this appeal. In effect, the government now wants the $85,773 (which both Friedman and Unisource say belongs to Unisource) to apply against Friedman's one million dollar restitution obligation, thus lowering the risk that the full sum of restitution will not be collected over time.[2]

letters as proper under Fed. R.App. P. 10(e) ("If anything material to either party is omitted from the record by error or accident or is misstated therein, the parties by stipulation ... either before or after the record is transmitted to the court of appeals ... may direct that the omission or misstatement be corrected....") To the extent that these letters contain argument on other matters, we do not consider them. *See* Fed. R.App. P. 28(c) ("No further briefs may be filed except with leave of court.")

At any event, even if Unisource's motion and the April agreement attached thereto were not filed with the district court, counsel for both

Friedman and Unisource described the situation to the district judge on the record and counsel for the government did not contest the accuracy of that description. The district judge was entitled to credit counsels' representations concerning the underlying situation in the absence of any objection from the government.

2. Friedman defends the district court order, arguing that because the district court plainly did have authority to spread the restitution order out over time, the district court's order effectively does the same thing and so cannot be improper. We need not reach this argument. Friedman's

## II.

This appeal involves only the narrow issue of whether the district court had authority to permit Unisource to be paid from the proceeds of the sale. The government argues that the district court did not. Friedman did not file a cross-appeal challenging the district court's implicit determination that an interest in the condominium could be attributed to him, and that issue is therefore not before us.

The government argues that the district court's order permitting Unisource to be paid from the proceeds of the sale exceeded the district court's authority under the VWPA, 18 U.S.C. § 3663–64.[3] The government argues that the district court order permitting Unisource to be paid was an order of "restitution," and that, under the VWPA, "restitution may be awarded only to a 'victim of the offense.'" *United States v. Gibbens*, 25 F.3d 28, 33 (1st Cir.1994) (quoting 18 U.S.C. § 3663(b)(1)).

We have no quarrel with the government's position that orders of restitution under the VWPA can only be awarded to the victim of a defendant's offense, and that ordinary creditors of a defendant may not entitle themselves to consideration for restitution by intervening at a sentencing hearing. However, we think the government's characterization of what occurred in the district court misses the mark. Although the district court's order permitting Unisource to be paid is memorialized in a portion of the amended criminal judgment labeled "restitution and forfeiture," the sentencing hearing makes clear that the district court did not consider its order as an order requiring Friedman to pay restitution to Unisource under the VWPA. Instead, the district court accepted Unisource's argument that it had an equitable lien or other definite interest that was protected by the court's June order

which had directed the U.S. Marshals to seize only the net sale proceeds of the condominium.

■ Thus, the district court never considered its authority to release funds to Unisource from the seizure as stemming from the VWPA directly; rather, its authority derived from its inherent authority to issue all writs necessary in aid of its jurisdiction under the All Writs Act, 28 U.S.C. § 1651, authority which certainly includes the power to issue a subsequent order which is needed to implement an earlier order which the district court had authority to issue. Therefore, if the district court had authority to release funds to Unisource, it stems from its authority to implement its earlier June order, obtained ex parte at the government's request, to seize the net proceeds of the condominium sale. The order, by its terms, excluded "all secured claims, liens and other costs associated with the real estate closing. . . ." We note that this language came from the government's ex parte motion.

If the district court did not err in its interpretation of its own earlier June order, its decision to release funds to Unisource can be sustained as within the district court's authority under 28 U.S.C. § 1651. The government does not contend that the district court's June order, obtained ex parte at the government's request, violated the VWPA because it permitted "secured claims, liens and other costs associated with the real estate closing" to be satisfied before the seizure of the balance of the proceeds for the ultimate purpose of providing restitution to victims. Indeed, the government proposed that language. Nor does the government contend that the district court lacked authority to correct a mistake in the implementation of its June order. The district court plainly could have required, for example, that

interest in this appeal is at least two-fold. Unisource is a significant creditor of Friedman's family business, Aim Chemical, and its willingness to continue doing business with Aim Chemical depends on its getting the $85,773. Friedman wants Unisource to continue to do business with Aim Chemical both because Aim Chemical is a source of income to his family and because any revenues from Aim Chemical may be used to meet his restitution obligation.

3. The parties have helpfully called the court's attention to the question of whether the operative VWPA is the 1988 Amended Act, which was in place at the time of the conduct, or the 1996 Amended Act, in place at the time of sentencing, and attendant potential ex post facto clause problems. In light of our disposition, we need not address this issue, as the outcome is not affected by which version of the VWPA applies.

the U.S. Marshals release funds to a holder of a mortgage interest in the property whose interest had been mistakenly seized at the real estate closing, despite the fact that such a person, like Unisource, would not have been a victim of the offense under the VWPA.

Instead, the government contends that the district court's order protected only secured creditors and that Unisource, which had not filed a formal attachment, was not secured. The government also argues that, because Unisource was in its view merely an ordinary, unsecured trade creditor, affirming the district court's actions would risk transforming sentencing proceedings into equitable bankruptcy-style proceedings in which various creditors of the defendant would be permitted to make claims against the defendant's property. This, argues the government, would frustrate Congress' intent that the award of restitution to victims of crime should be the primary focus of sentencing proceedings, and that victims' claims should take priority over those of many other creditors. *See* 18 U.S.C. § 3613(c) (giving liens created by orders of restitution the same status as tax liens).

 We do not agree that affirming the district court's actions presents such a danger given the particular circumstances of this case. First, the government's argument assumes that Unisource was an ordinary trade creditor, and we believe that the record does not support this contention. Under Massachusetts law, an equitable lien is defined as "a charge upon specific property, entitling the holder of the lien to have the property applied in equity to the payment of his debt as against all other claimants of the property except purchasers for value without notice." *Ballentine v. Eaton*, 297 Mass. 389, 8 N.E.2d 808, 809 (1937). In Massachusetts, an equitable lien may arise from the express agreement of a debtor to pay a creditor out of a specific fund or property. *See Check v. Kaplan*, 280 Mass. 170, 182 N.E. 305, 306 (1932) ("[A]s between the parties a right in the nature of a lien on an identified and particular fund may be created [by express agreement] which will in appropriate circumstances by enforced in equity"); *Delval v.*

*Gagnon*, 213 Mass. 203, 99 N.E. 1095 (1912); *Pinch v. Anthony*, 90 Mass. (8 Allen) 536, 539 (1864) ("The rule is perfectly well settled, that a party may by express agreement create a charge or claim in the nature of a lien on real as well as personal estate of which he is the owner or possessor, and that equity will establish and enforce such a claim . . . ."). A leading legal dictionary defines the term "equitable lien" as follows:

> A right, not existing at law, to have specific property applied in whole or in part to payment of a particular debt or class of debts. An equitable lien arises either from a written contract which shows an intention to charge some particular property with a debt or obligation or is implied and declared by a court of equity out of general considerations of right and justice as applied to relations of the parties and circumstances of their dealings.

*Black's Law Dictionary* 539 (6th ed.1990) (citations omitted).

Given these legal principles, Unisource was no ordinary unsecured trade creditor seeking to satisfy a debt, as the government contends. Rather, it had earlier arranged a payment plan with the Friedman business that included a personal guarantee of its debts from Leslie Friedman, a guarantee that specifically included the condominium at issue. After the Friedman business had again become delinquent in its payments under the payment plan, Unisource announced its intention to initiate proceedings to formally attach the condominium. Only after receiving a written promise that its debt would be satisfied from the proceeds of the impending sale did Unisource forbear from seeking the attachment. Unisource's forbearance benefitted all parties by facilitating the sale. This, in turn, provided the victim FDIC with substantial monetary restitution that might well have been reduced if the property had not been sold at the time, but sold later at auction, quite probably at a lower price.

 Under these circumstances, it was not clearly erroneous for the district court to conclude that Unisource held an equitable lien under Massachusetts law arising from the April agreement. *See Check*, 182 N.E. at 306 (regarding the existence of an equitable

lien arising from the parties' express agreement as "a pure question of fact upon which the decision of the trial judge must stand"). Moreover, even if the interest was not definite enough to rise to the level of a lien under Massachusetts law, the June order did not protect only lienholders. Rather, it also protected other third parties who expected to be paid from the proceeds of the condominium sale, such as the attorneys and brokers, none of whom necessarily had a secured interest in the property. The district court was thus within its discretion to interpret its own June order as protecting Unisource's interest in these circumstances. Although Unisource's claim was not specifically mentioned as among those interests that would be satisfied prior to seizure of the balance, this is explained by the fact that the order was obtained ex parte at the government's request without notice to Friedman or potential creditors. Under such circumstances, the district court did not err by interpreting its earlier order as including Unisource as among those claimants it intended to protect.

We emphasize the narrowness of our decision. It was the government which asked for the June order to be drafted in a manner that permitted the sale to take place and which protected the interests of those third parties who legitimately expected to be paid from the proceeds of the sale. The government did not request that only claimants with interests superior to its own (as yet inchoate) interest in the property be paid before the balance was seized for the anticipated restitution order; rather, the June order directed that "*all* secured claims, liens, and other costs associated with the real estate closing [be] paid" (emphasis added).

We express no opinion on whether, if the government had instead sought to prevent the sale pursuant to the district court's March order and had asserted a lien against the property arising from a future restitution order, its interest would have been superior to Unisource's interest. Second, as the district court never ruled on Unisource's motion to intervene, we express no opinion on whether it was entitled to be heard at the sentencing hearing, although we believe the district judge could permit Unisource's attorney to address the court under the circumstances. Finally, this decision most emphatically does not endorse broad bankruptcy-style proceedings in the guise of sentencing hearings; such hearings would likely frustrate Congress' intent in enacting the VWPA. We hold only that, in the particular circumstances of this case, the district court did not err by regarding Unisource's interest in the proceeds of the sale of the condominium as sufficiently definite that it was within the terms of its June order. Thus, the district court had authority under 28 U.S.C. § 1651 to order that funds be released permitting Unisource to be paid from the proceeds of the sale of the Friedman condominium. The fact that the challenged order was part of a larger order labeled a "restitution" order was an apparent slip of the pen, and we see no need to elevate form over substance.

The judgment of the district court is *affirmed.*