USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-2100

 UNITED STATES OF AMERICA,

 Appellant,

 v.

 ARNOLD I. FRIEDMAN,

 Defendant, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Nancy Gertner, U.S. District Judge]
 

 Before
 
 Lynch, Circuit Judge,
 Coffin and Bownes, Senior Circuit Judges.
 

 Christopher Alberto, Assistant U.S. Attorney, with whom Donald
K. Stern, U.S. Attorney, was on brief, for appellant.

 Robert L. Sheketoff, with whom Sheketoff & Homan were on
brief, for appellee.

 Jonathon D. Friedmann, with whom Gustavo A. del Puerto and
Gargill, Sassoon & Rudolph, LLP were on brief, for amicus curiaeUnisource Worldwide, Inc.
 
 
 
 
 
 May 5, 1998
 
 
 
 LYNCH, Circuit Judge. Arnold I. Friedman was convicted
of defrauding several federally insured banks and ordered at
sentencing to pay restitution to the Federal Deposit Insurance
Corporation (FDIC), the victim of his offenses. Before sentencing,
the district court granted the government's ex parte order to seize
the net proceeds of the sale of his family's oceanfront condominium
to satisfy any court-imposed penalties. The government appeals an
order by the district court allowing Unisource Worldwide, Inc.
(Unisource), a creditor of defendant's business who had a guarantee
from defendant's wife backed up by her interest in the condominium,
to be paid from proceeds of the sale, as the holder of an interest
in the nature of an equitable lien against the condominium.
 The government argues that this decision exceeded the
district court's authority under the Victim Witness Protection Act
(VWPA), 18 U.S.C. 3663-64, because Unisource was not the victim
of defendant's offenses. The government also argues that affirming
the judge's order would risk transforming sentencing proceedings
into equitable bankruptcy-style proceedings, thus frustrating
Congress' basic intent to provide restitution for victims. The
government's concerns, if they were actually raised by the facts of
this case, would present difficult questions under the VWPA.
 We believe that, given the particular facts of this case,
affirming the district court's order does not present the dangers
the government fears because we do not agree that the district
court's order releasing funds to Unisource was an order of
"restitution" to Unisource under the VWPA. Rather, we regard the
order as an implementation, permissible given the particular
circumstances, of the district court's earlier orders affecting
defendant's property. We affirm.
 I. On October 8, 1996, Arnold I. Friedman pled guilty to
charges of bank fraud in violation of 18 U.S.C. 1344 and of
making false statements in violation of 18 U.S.C. 1014. The
charges stemmed from check-kiting schemes in which Friedman
defrauded several federally insured banks. The government, seeking
to ensure that Friedman's assets would be available to satisfy any
court-imposed penalties, filed an ex parte motion under Fed. R.
Crim. Pro. 45(d) requesting an order pursuant to the All Writs Act,
28 U.S.C. 1651, that would temporarily restrain Friedman from
transferring any assets. On March 14, 1997, the district court
issued this order, requiring Friedman "to cease all transfers of
assets and funds" and directing that "institutions and individuals
who hold any assets or funds in which Arnold I. Friedman holds an
ownership interest shall not transfer any such fund or assets until
further order of this Court."
 One asset that belonged to members of the Friedman family
at this time was a condominium located in Swamscott, Massachusetts. 
The owner of the condominium was the Cupid Ocean Front Realty
Trust; the trustee was Kim Friedman, Arnold Friedman's adult
daughter, and the sole beneficiary was Leslie Friedman, Arnold
Friedman's wife. At the time of the court's March order, the
condominium had been appraised at approximately $609,000. On
paper, Arnold Friedman had no interest in the trust or the
condominium. However, the government contended that Friedman in
fact controlled the asset and that it should be attributed to him,
noting that he had lived in the condominium since its purchase in
1993 and that he listed the condominium as an asset belonging to
him in a February 1997 mortgage application. Arnold Friedman
acknowledges that, although his position was that the condominium
belonged to his wife through a valid real estate trust, a court
might conclude that he controlled the condominium.
 Friedman had disclosed the existence of the condominium
and the trust to the government at a presentence interview. 
Friedman's lawyer advised him that, because the district court's
March order only covered assets in which he had an ownership
interest, the family was free to put the condominium up for sale. 
The condominium was listed with a broker. After a few months, the
family received an offer of approximately $950,000 for the
condominium. The closing date was June 26, 1997.
 According to Friedman's lawyer, after the government
learned of the impending sale of the condominium, there was a
meeting between Arnold Friedman, his lawyer and officials of the
Probation Department and the United States Attorney's Bank Fraud
Task Force. At that meeting, Friedman's lawyer claimed, the
government agreed to permit the sale of the condominium as long as
$250,000 from the proceeds of the sale were put in escrow to be
available at sentencing if the court ruled that the condominium
belonged to Arnold Friedman. The government disputes that such an
agreement ever existed, but does not dispute that such a meeting
took place.
 In any event, the government never sought to stop the
sale of the condominium on the ground that the sale would violate
the court's March order. Rather, on June 25, 1997, the day before
closing, the government requested an ex parte order, again pursuant
to the All Writs Act, 28 U.S.C. 1651, directing the United States
Marshals to seize the net proceeds of the sale. Friedman contends
that the government's action in seeking the order violated the
earlier agreement, and suggests that the order was sought by a
different set of government attorneys than those that were present
at the meeting. The court granted the ex parte order.
 The order required "all proceeds, (after all secured
claims, liens and other costs associated with the real estate
closing are paid) generated by the . . . sale of the condominium
. . . [to] be turned over to the United States Marshals Service
. . . ." The order also directed the U.S. Marshals to hold the
funds "until further order of the Court . . . ."
 Pursuant to this order, the following day the U.S.
Marshals seized the proceeds of the sale of the condominium at the
closing. The U.S. Marshals obtained a check for $342,899, which
represented the sale price of the condominium ($954,617), less the
amount of a mortgage loan ($445,935), another loan ($125,687),
settlement costs, including attorney's fees, title insurance,
broker's commission, etc. ($31,421), and taxes and utility fees to
the Town of Swamscott ($8950).
 As a result of the seizure, one creditor was not paid who
had expected to be paid from the proceeds of the sale. That
creditor, Unisource, was a supplier of Aim Chemical Enterprises, a
business which Arnold and Leslie Friedman owned and operated
jointly. Under a credit arrangement with Unisource, Leslie
Friedman had issued a personal guarantee of Aim Chemical's debts to
Unisource, a guarantee that specifically included the condominium. 
Aim Chemical had difficulty paying its bills, and Aim Chemical and
Unisource worked out a payment plan. In early 1997, Aim Chemical
defaulted on this payment plan, and Unisource indicated that it
would take legal action to collect.
 At that time, Leslie Friedman asked Unisource not to
attach the Swamscott property through formal legal proceedings
because she believed it would have a chilling effect on the
impending sale. Unisource agreed to forbear from filing a formal
attachment, but only after receiving Leslie Friedman's written
guarantee, through her attorney, that it would be paid "[f]rom the
proceeds of the sale of the property" an amount "equal to any
amounts due and owning [sic] and outstanding for more than thirty
(30) days prior to the closing date . . . ." The agreement stated
that, "[s]imultaneously with the closing," this amount would be
delivered to Unisource in a check. That amount, $85,773, was not
paid to Unisource at the closing, as Unisource and Mrs. Friedman
had agreed, and those funds were instead seized by the U.S.
Marshals.
 The day after closing, June 27, 1997, Unisource filed a
pleading styled "Motion of Unisource Worldwide, Inc. to Intervene
for a Limited Purpose," purportedly pursuant to Fed. R. Civ. P.
24(a)(2). The motion requested that the district court "permit[]
Unisource to be paid from the proceeds of the sale as if it had
perfected its lien," arguing that its forbearance had benefitted
all parties, including the government, by facilitating a sale that
might have been discouraged if Unisource had sought to attach the
condominium through formal legal proceedings. Unisource argued
that its interest was sufficiently definite to come within the
terms of the district court's June order directing that all
"secured claims, liens and other costs associated with the real
estate closing" should be paid from the proceeds of the sale prior
to the seizure by the U.S. Marshals of the balance.
 At a sentencing hearing on July 30, 1997, the district
court heard arguments on the condominium issue. The defendant
argued that the property belonged to his wife, as beneficiary of
the real estate trust, although he acknowledged that his control of
that asset rendered the issue close. The defendant also urged the
court to permit Unisource to be paid, arguing that it was necessary
for Aim Chemical's continued viability that its creditors be paid
and that Aim Chemical's continued profitability would ensure his
ability to pay the district court's restitution order. 
 The government argued that the condominium did belong to
Friedman. The government also argued that Unisource was an
unsecured creditor, and that its interest was therefore not covered
by the June order. Finally, the government argued that the
district court could not release any funds to Unisource because it
was not a victim of the defendant's crimes, and that the district
court lacked authority under the VWPA to do anything but order
restitution to the victim.
 Although the district court never acted on Unisource's
motion to intervene, it permitted counsel for Unisource to address
the court during the sentencing hearing. Unisource argued that its
interest in the proceeds of the sale under the letter agreement was
protected by the district court's June order, and that it should be
paid from the proceeds as the holder of an equitable lien to remedy
the improper seizure of its share.
 The district court accepted this argument. It ordered
restitution to the FDIC in the amount of $1,000,000, and further
directed in its amended criminal judgment that "monies seized by
the government will be released to probation officer to be
distributed to creditor Unisource (not the victim of the instant
offense) and victim FDIC." The government filed numerous motions
seeking reconsideration of the order permitting Unisource to be
paid, each of which was denied. 
 The government then filed this appeal. In effect, the
government now wants the $85,773 (which both Friedman and Unisource
say belongs to Unisource) to apply against Friedman's one million
dollar restitution obligation, thus lowering the risk that the full
sum of restitution will not be collected over time.
 II.
 This appeal involves only the narrow issue of whether the
district court had authority to permit Unisource to be paid from
the proceeds of the sale. The government argues that the district
court did not. Friedman did not file a cross-appeal challenging
the district court's implicit determination that an interest in the
condominium could be attributed to him, and that issue is therefore
not before us.
 The government argues that the district court's order
permitting Unisource to be paid from the proceeds of the sale
exceeded the district court's authority under the VWPA, 18 U.S.C.
 3663-64. The government argues that the district court order
permitting Unisource to be paid was an order of "restitution," and
that, under the VWPA, "restitution may be awarded only to a 'victim
of the offense.'" United States v. Gibbens, 25 F.3d 28, 33 (1st
Cir. 1994) (quoting 18 U.S.C. 3663(b)(1)).
 We have no quarrel with the government's position that
orders of restitution under the VWPA can only be awarded to the
victim of a defendant's offense, and that ordinary creditors of a
defendant may not entitle themselves to consideration for
restitution by intervening at a sentencing hearing. However, we
think the government's characterization of what occurred in the
district court misses the mark. Although the district court's
order permitting Unisource to be paid is memorialized in a portion
of the amended criminal judgment labeled "restitution and
forfeiture," the sentencing hearing makes clear that the district
court did not consider its order as an order requiring Friedman to
pay restitution to Unisource under the VWPA. Instead, the district
court accepted Unisource's argument that it had an equitable lien
or other definite interest that was protected by the court's June
order which had directed the U.S. Marshals to seize only the net
sale proceeds of the condominium. 
 Thus, the district court never considered its authority
to release funds to Unisouce from the seizure as stemming from the
VWPA directly; rather, its authority derived from its inherent
authority to issue all writs necessary in aid of its jurisdiction
under the All Writs Act, 18 U.S.C. 1651, authority which
certainly includes the power to issue a subsequent order which is
needed to implement an earlier order which the district court had
authority to issue. Therefore, if the district court had authority
to release funds to Unisource, it stems from its authority to
implement its earlier June order, obtained ex parte at the
government's request, to seize the net proceeds of the condominium
sale. The order, by its terms, excluded "all secured claims, liens
and other costs associated with the real estate closing . . . ." 
We note that this language came from the government's ex parte
motion.
 If the district court did not err in its interpretation
of its own earlier June order, its decision to release funds to
Unisource can be sustained as within the district court's authority
under 28 U.S.C. 1651. The government does not contend that the
district court's June order, obtained ex parte at the government's
request, violated the VWPA because it permitted "secured claims,
liens and other costs associated with the real estate closing" to
be satisfied before the seizure of the balance of the proceeds for
the ultimate purpose of providing restitution to victims. Indeed,
the government proposed that language. Nor does the government
contend that the district court lacked authority to correct a
mistake in the implementation of its June order. The district
court plainly could have required, for example, that the U.S.
Marshals release funds to a holder of a mortgage interest in the
property whose interest had been mistakenly seized at the real
estate closing, despite the fact that such a person, like
Unisource, would not have been a victim of the offense under the
VWPA.
 Instead, the government contends that the district
court's order protected only secured creditors and that Unisource,
which had not filed a formal attachment, was not secured. The
government also argues that, because Unisource was in its view
merely an ordinary, unsecured trade creditor, affirming the
district court's actions would risk transforming sentencing
proceedings into equitable bankruptcy-style proceedings in which
various creditors of the defendant would be permitted to make
claims against the defendant's property. This, argues the
government, would frustrate Congress' intent that the award of
restitution to victims of crime should be the primary focus of
sentencing proceedings, and that victims' claims should take
priority over those of many other creditors. See 18 U.S.C. 
3613(c) (giving liens created by orders of restitution the same
status as tax liens).
 We do not agree that affirming the district court's
actions presents such a danger given the particular circumstances
of this case. First, the government's argument assumes that
Unisource was an ordinary trade creditor, and we believe that the
record does not support this contention. Under Massachusetts law,
an equitable lien is defined as "a charge upon specific property,
entitling the holder of the lien to have the property applied in
equity to the payment of his debt as against all other claimants of
the property except purchasers for value without notice." 
Ballentine v. Eaton, 8 N.E.2d 808, 809 (Mass. 1937). In
Massachusetts, an equitable lien may arise from the express
agreement of a debtor to pay a creditor out of a specific fund or
property. See Check v. Kaplan, 182 N.E. 305, 306 (Mass. 1932)
("[A]s between the parties a right in the nature of a lien on an
identified and particular fund may be created [by express
agreement] which will in appropriate circumstances by enforced in
equity"); Delval v. Gagnon, 99 N.E. 1095 (Mass. 1912); Pinch v.
Anthony, 90 Mass. (8 Allen) 536, 539 (1864) ("The rule is perfectly
well settled, that a party may by express agreement create a charge
or claim in the nature of a lien on real as well as personal estate
of which he is the owner or possessor, and that equity will
establish and enforce such a claim . . . ."). A leading legal
dictionary defines the term "equitable lien" as follows:
 A right, not existing at law, to have specific
 property applied in whole or in part to
 payment of a particular debt or class of
 debts. An equitable lien arises either from a
 written contract which shows an intention to
 charge some particular property with a debt or
 obligation or is implied and declared by a
 court of equity out of general considerations
 of right and justice as applied to relations
 of the parties and circumstances of their
 dealings.

Black's Law Dictionary 539 (6th ed. 1990) (citations omitted).
 Given these legal principles, Unisource was no ordinary
unsecured trade creditor seeking to satisfy a debt, as the
government contends. Rather, it had earlier arranged a payment
plan with the Friedman business that included a personal guarantee
of its debts from Leslie Friedman, a guarantee that specifically
included the condominium at issue. After the Friedman business had
again become delinquent in its payments under the payment plan,
Unisource announced its intention to initiate proceedings to
formally attach the condominium. Only after receiving a written
promise that its debt would be satisfied from the proceeds of the
impending sale did Unisource forbear from seeking the attachment. 
Unisource's forbearance benefitted all parties by facilitating the
sale. This, in turn, provided the victim FDIC with substantial
monetary restitution that might well have been reduced if the
property had not been sold at the time, but sold later at auction,
quite probably at a lower price.
 Under these circumstances, it was not clearly erroneous
for the district court to conclude that Unisource held an equitable
lien under Massachusetts law arising from the April agreement. SeeCheck, 182 N.E. at 173 (regarding the existence of an equitable
lien arising from the parties' express agreement as "a pure
question of fact upon which the decision of the trial judge must
stand"). Moreover, even if the interest was not definite enough to
rise to the level of a lien under Massachusetts law, the June order
did not protect only lienholders. Rather, it also protected other
third parties who expected to be paid from the proceeds of the
condominium sale, such as the attorneys and brokers, none of whom
necessarily had a secured interest in the property. The district
court was thus within its discretion to interpret its own June
order as protecting Unisource's interest in these circumstances. 
Although Unisource's claim was not specifically mentioned as among
those interests that would be satisfied prior to seizure of the
balance, this is explained by the fact that the order was obtained
ex parte at the government's request without notice to Friedman or
potential creditors. Under such circumstances, the district court
did not err by interpreting its earlier order as including
Unisource as among those claimants it intended to protect.
 We emphasize the narrowness of our decision. It was the
government which asked for the June order to be drafted in a manner
that permitted the sale to take place and which protected the
interests of those third parties who legitimately expected to be
paid from the proceeds of the sale. The government did not request
that only claimants with interests superior to its own (as yet
inchoate) interest in the property be paid before the balance was
seized for the anticipated restitution order; rather, the June
order directed that "all secured claims, liens, and other costs
associated with the real estate closing [be] paid" (emphasis
added). 
 We express no opinion on whether, if the government had
instead sought to prevent the sale pursuant to the district court's
March order and had asserted a lien against the property arising
from a future restitution order, its interest would have been
superior to Unisource's interest. Second, as the district court
never ruled on Unisource's motion to intervene, we express no
opinion on whether it was entitled to be heard at the sentencing
hearing, although we believe the district judge could permit
Unisource's attorney to address the court under the circumstances. 
Finally, this decision most emphatically does not endorse broad
bankruptcy-style proceedings in the guise of sentencing hearings;
such hearings would likely frustrate Congress' intent in enacting
the VWPA. We hold only that, in the particular circumstances of
this case, the district court did not err by regarding Unisource's
interest in the proceeds of the sale of the condominium as
sufficiently definite that it was within the terms of its June
order. Thus, the district court had authority under 28 U.S.C. 
1651 to order that funds be released permitting Unisource to be
paid from the proceeds of the sale of the Friedman condominium. 
The fact that the challenged order was part of a larger order
labeled a "restitution" order was an apparent slip of the pen, and
we see no need to elevate form over substance.
 The judgment of the district court is affirmed.