# United States Court of Appeals
## For the First Circuit

---

No. 04-2237

UNITED STATES OF AMERICA,

Appellee,

v.

PETER GOMES FONTES,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

---

Before

Boudin, Chief Judge,

Lynch and Lipez, Circuit Judges.

---

Timothy G. Watkins, Federal Defender Office, for appellant.
Nancy Rue, Assistant United States Attorney, with whom Michael
J. Sullivan, United States Attorney, and Rachel E. Hershfang,
Assistant United States Attorney, were on brief, for appellee.

---

July 20, 2005

---

LIPEZ, **Circuit Judge**.  Defendant-appellant Peter Gomes Fontes ("Fontes") challenges his sentence for drug trafficking crimes on the ground that the district court's finding that the government engaged in sentencing factor manipulation entitles him to a sentence below the statutory mandatory minimum.  Specifically, Fontes assails the district court's ultimate conclusion that his predisposition to commit the crimes for which he was convicted prevented the government's misconduct from being "extreme and outrageous" enough to warrant a sentence below the mandatory minimum.  Discerning no reason to disturb the district court's considered resolution of this fact-intensive inquiry, we affirm Fontes's sentence.

**I.**

On March 31, 2004, Fontes pled guilty to one count of conspiracy to distribute 50 grams or more of crack cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), and one count of distribution and possession with intent to distribute crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), based on his sale of 59.2 grams of crack to a friend and drug associate-turned-government informant on January 3, 2003. During his plea colloquy, Fontes admitted that his offenses involved the quantity and type of cocaine alleged in the indictment (at least 50 grams, or approximately two ounces, of crack). Nevertheless, relying on United States v. Montoya, 62 F.3d 1, 4

(1st Cir. 1995), Fontes sought a downward departure from the applicable Guidelines sentencing range and/or a sentence below the statutory mandatory minimum on the theory that government agents had engaged in sentencing factor manipulation by instructing the informant to purchase two ounces of crack cocaine, which carries a statutory mandatory minimum term of imprisonment of ten years, rather than the same quantity of powder cocaine, which carries no statutory mandatory minimum sentence and results in a lower Guidelines sentencing range. See 21 U.S.C. § 841(b)(1)(A) (imposing statutory mandatory minimum sentence for violation involving "50 grams or more of a mixture or substance . . . which contains cocaine base," but no mandatory minimum sentence for a violation involving less than 500 grams of cocaine powder); U.S.S.G. § 2D1.1© (Drug Quantity Table) (2003).

After an evidentiary hearing on August 6 and August 18, 2004, during which the informant and an FBI special agent testified, the district court found that the government had engaged in sentencing factor manipulation by ordering the informant to purchase crack cocaine with the intent of securing a higher sentence. However, the court concluded that, in light of Fontes's predisposition to sell crack, the government's conduct was not "extreme and outrageous," and the court therefore could not impose a sentence below the statutory mandatory minimum. See Montoya, 62 F.3d at 4 (court may impose sentence below statutory mandatory

-3-

minimum for "sentencing manipulation amounting to 'extraordinary misconduct'"). The district court declined to consider whether the government's misconduct nevertheless warranted a downward departure from the applicable Guidelines sentencing range of 140-175 months of imprisonment.[1] See id. at 4-5 (entertaining possibility that "a district court may order a discretionary downward departure from the guideline range on something less than extraordinary misconduct"). Instead, predicting that the Supreme Court would soon declare the federal sentencing Guidelines unconstitutional,[2] the court imposed a non-Guidelines sentence of 126 months of imprisonment -- above the statutory mandatory minimum of 120 months but below the applicable Guidelines sentencing range -- which it

---

[1]Based on the total amount of crack and powder cocaine involved in Fontes's relevant conduct, the pre-sentence investigation report (PSR) recommended a base offense level of 32, a reduction of three levels to 29 for acceptance of responsibility, and a Criminal History Category of V.

[2]The Supreme Court had recently granted certiorari but had not yet heard oral argument in two consolidated cases in order to consider the effect of its decision in Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), on the federal sentencing Guidelines. See United States v. Booker, 125 S. Ct. 11 (August 2, 2004); United States v. Fanfan, 125 S. Ct. 12 (August 2, 2004). In January 2005, the Court held that "the Sixth Amendment as construed in Blakely does apply to the Sentencing Guidelines" and that, "in light of this holding, two provisions of the Sentencing Reform Act of 1984 (SRA) that have the effect of making the Guidelines mandatory [18 U.S.C. §§ 3553(b)(1) and 3742(e)] must be invalidated in order to allow the statute to operate in a manner consistent with congressional intent." United States v. Booker, 125 S. Ct. 738, 746 (2005).

considered to be "fair and just."  The court also imposed a five-year term of supervised release and a special assessment of $200.

Fontes timely appealed, contesting the court's ultimate conclusion that the government's sentencing factor manipulation was not "extreme and outrageous" enough to justify a sentence below the statutory mandatory minimum.  See 18 U.S.C. § 3742(a)(1) (defendant may appeal sentence on ground that it "was imposed in violation of law").[3]

**II.**

We recount the facts as set forth in uncontested portions of the pre-sentence investigation report and the transcripts of the sentencing hearing.  United States v. Lagasse, 87 F.3d 18, 20 (1st Cir. 1996).  In August and September 2002, the FBI debriefed a potential informant facing state drug charges who agreed to collect evidence against his drug associates, including Fontes, whom the informant had known for more than five years.  At the evidentiary hearing, the informant testified that he began selling drugs in

---

[3]Fontes does not challenge the court's underlying factual determinations or argue that, absent the alleged legal error, his sentence was otherwise unreasonable.  See Booker, 125 S. Ct. at 765 (federal sentences reviewable on appeal for unreasonableness). Furthermore, as Fontes was not sentenced under a mandatory Guidelines regime, he raises no claim of Booker error.

The government filed a notice of appeal on September 24, 2004, but this court issued an order to show cause on October 7, 2004 observing that the government's notice of appeal appeared to be untimely.  On November 5, 2004, this court granted the government's motion to voluntarily dismiss the appeal pursuant to Fed. R. App. P. 42(b).

1999 or 2000 and that he told FBI agents during interviews that he and Fontes sold each other powder cocaine on occasion.

On October 22, 2002, the government authorized the informant to make a controlled purchase of more than four ounces of powder cocaine from Fontes for $3900 in government funds. Due to technical and other unexpected difficulties, however, the FBI was unable to maintain surveillance of the informant or to record the transaction. According to the FBI agent, the government decided not to prosecute Fontes for the offense because the informant's first-hand account of the transaction constituted the only evidence of the circumstances of the sale.[4]

FBI agents subsequently learned, by listening to recorded conversations between the informant and others, that some of Fontes's drug associates dealt cocaine in the form of crack. The informant testified that when the agents asked him to explain code words or slang used during these recorded conversations, he told them they were references to crack cocaine. In his testimony, the agent explained that the informant "didn't tell us that any of the individuals had sold crack. It was something that we learned during the course of the investigation. The other defendants . . . were talking about it. And, we [knew] those

_____

[4]Fontes's uncharged sale of over four ounces of powder cocaine to the informant on October 22, 2002 was apparently treated as relevant conduct, and 123.9 grams of cocaine powder were apparently included in the PSR's calculation of Fontes's base offense level. See supra, note 1.

people to be associates of Mr. Fontes."  As the agent put it, "it became clear to us that this group dealt in crack cocaine."

FBI agents then instructed the informant to make a second controlled purchase of drugs from Fontes, this time in the form of crack, rather than powder cocaine.  In the informant's words, the agents told him, "if he comes with the crack, buy it, if he doesn't, don't buy it."  The agent testified that he directed the informant to purchase two ounces of crack, which the informant testified was a commonly sold quantity.  At this point in the investigation, the agent testified, "I had no specific information whether or not Mr. Fontes would sell that product, meaning crack cocaine.  I had no information whether he would or would not."  The agent explained, "I just simply thought he might be amenable to doing it since . . . two of his associates were."

On December 20, 2002, Fontes and the informant met at a pizza restaurant to negotiate a price for the second drug transaction.  Although the informant wore a wire to record the conversation, the tape did not clearly reveal whether the informant specified to Fontes that he wished to purchase crack rather than powder cocaine.  The informant testified, however, that he told the agents he had negotiated a deal with Fontes to purchase two ounces of crack.  The agent testified that the informant also reported that Fontes had shown him a gun during their meeting.  On January 2, 2003, the informant spoke to Fontes in a recorded phone call to

confirm the quantity of drugs and to make arrangements for the sale the next day.  Again, the recording revealed no specific reference to crack cocaine.

On January 3, 2003, the informant picked up Fontes in a government-provided car rigged with hidden audio and video recording equipment.  At the sentencing hearing, the government published excerpts from the informant's recording and asked the informant to describe the events captured on the tape.  The government later submitted a transcript of the audio recording to the district court at the court's request.  The transcript reveals that when Fontes entered the car, he told the informant that he had just provided a half-ounce of cocaine powder to someone else and that he had cooked the powder into crack for that person.  During the evidentiary hearing, the informant explained that certain code words or slang (i.e., "chef'd") used during his conversation with Fontes were references to crack or the act of cooking powder cocaine into crack.  According to the informant, Fontes then told him that they had to drive to another town to pick up the drugs the informant had ordered, since Fontes had already distributed one-and-a-half ounces of his two-ounce supply.  When Fontes and the informant arrived at their destination outside an apartment building, a third person got in the car and handed Fontes a bag while the informant drove around the block.  After dropping off the

third person at the apartment building, the informant paid Fontes $1900 in government funds, and Fontes gave him the bag.

The informant quickly realized that the bag contained powder, not crack, cocaine. According to the transcript of the taped conversation, he protested, "I wanted it cooked, [the customer] wanted it cooked." Fontes responded, "You wanted it chef'd?" and asked the informant, "You don't know how to chef . . . ?" The informant replied, "Nah, I don't have time, too." Fontes then told the informant, "Hold up, I'll probably get a trade," and made a cell phone call. Instead of a trade, Fontes arranged to drop off the powder back at the apartment building, where someone would cook it into crack.

According to the transcript, Fontes then said that if he had known at the outset that the informant wanted to purchase crack instead of powder cocaine, "I would have had it chef'd." When the informant countered that he had told Fontes his customer wanted crack, Fontes replied, "Yo, but I figured you, . . . you could chef it yourself . . . . " Finally, Fontes lamented that he had had a half-ounce of crack available when the informant picked him up: "I had a heezy [a half-ounce] on me too, man, chef'd . . . . " After dropping the powder cocaine off with the same third person at the apartment building, Fontes and the informant drove around for about an hour before returning to the apartment building to pick up the cocaine, now cooked into crack, which weighed 59.2 grams.

During the evidentiary hearing, the FBI agent explained that the agents instructed the informant to purchase two ounces of crack in part because the government lacked the funds to make a second controlled purchase of powder cocaine in a quantity large enough to dispel suspicion, given the informant's purchasing history with Fontes. By contrast, the agent explained, "In my mind, [the informant] didn't deal in crack cocaine with Mr. Fontes previously. There was no history of large quantities and so, this was something that was new to us in this investigation." The agent further elaborated:

> At that point, we decided that it was cost effective to purchase crack. Being aware of the sentencing guidelines, being aware of the fact that the previous deal was for an eighth kilo of cocaine, which cost a lot of money, and so, what we were trying to do was to make one transaction, one additional transaction, get good evidence that would stand to indict and convict Mr. Fontes, and that's what we did.

When the court asked the agent, "What do you mean by 'being aware of the sentencing guidelines?'" the agent replied:

> I'm aware of the fact that there are guidelines that determine what a sentence is for a particular drug transaction, depending on what type of drug you are selling or purchasing, there are different sentences that are associated with the weights. So, in this case, there's different guidelines for cocaine, as opposed to crack cocaine, powder versus crack.

The court then asked, "So, you're trying to get a higher sentence?" The agent replied, "That's a part of it."

After the witnesses concluded their testimony on August 18, 2004, the court heard oral argument. Given the informant's history of purchasing only powder cocaine from Fontes and the agents' lack of information about whether Fontes actually distributed crack, Fontes maintained that the government's decision to instruct the informant to purchase crack instead of powder cocaine in order to procure a higher sentence amounted to sentencing factor manipulation, even if Fontes later turned out to have some predisposition to sell crack. The government countered that the agents legitimately sought to test whether Fontes, like his associates, would sell crack cocaine, even if they had no advance knowledge that Fontes was predisposed to sell cocaine in that form.

After argument, the court concluded: "I don't think given the fact of the predisposition of Mr. Fontes to sell crack that I can say [the government engaged in] extreme and outrageous conduct. But I think it's extremely troubling. I think it's wrong and troubling for the government to try and quadruple" the defendant's sentence.[5] The court continued: "I don't think that's a legitimate law enforcement goal. And, I am taking it into account in where I'm going to sentence him. But I don't think it's extreme and

---

[5]The applicable GSR for an offense involving more than 50 grams of crack (after accounting for Fontes's relevant conduct and other factors), as we have noted, was 140-175 months of imprisonment, while the GSR for an offense involving the same quantity of powder cocaine is 37-46 months of imprisonment.

outrageous because of the very strong evidence of predisposition to sell. That tape is devastating." Nevertheless, the court found that the FBI agent "basically admitted that they were trying to get a higher sentence."

The court then imposed a non-Guidelines sentence of 126 months of imprisonment, which it found to be "fair and just." The court explained, "[t]hat takes into account the mandatory minimum, which I don't think I can go below because I don't think it's extreme and outrageous conduct. On the other hand, because I find it so troubling, I am not going up as high as requested by the government." Addressing Fontes directly, the court then gave its rationale for imposing a sentence six months higher than the 120-month statutory mandatory minimum term of imprisonment: "[O]ne of the reasons [the FBI] was so out to get [you], if you will, [is] because you had a gun at the . . . [pizza] restaurant" where Fontes and the informant met on December 20, 2002. "You used guns. It wasn't the first time, it was the second or third time that you used it. . . . I am worried that you are going to be a recidivist."[6]

Finally, the court noted that if the Guidelines were upheld as constitutional, the applicable GSR would be based on a

---

[6]As we have discussed, the FBI agent testified at the evidentiary hearing that the informant reported that Fontes showed him a gun during the meeting at the pizza restaurant. Fontes does not contest the court's determination that he "used guns" more than once.

total offense level of 29 and a Criminal History Category of V, resulting in a sentencing range of 140-175 months of imprisonment. The court indicated that if the case were remanded for sentencing pursuant to the Guidelines, it would consider a downward departure from that range based on the government's misconduct, but in no event would it impose a sentence below the statutory mandatory minimum "because I can't say with that level of predisposition that it's extreme and outrageous." The court nevertheless admonished: "I think when you quadruple someone's sentence based on the situation where his track record with this particular informant was all powder and he thought it was powder, I think he -- basically you are talking your best friend into [selling] crack, the whole thing is troubling."

In its statement of reasons issued on August 20, 2004, the court reiterated its factual findings and legal conclusions:

> Based on the FBI agent's testimony, I find that the primary motivating factor for the decision by the FBI agent to order the informant to buy 2 ounces of crack (rather than powder, as in the earlier transaction [of October 22, 2002]) was to procure the highest possible penalty. . . . There was no investigative purpose to ordering crack (i.e., finding the source of the drugs or scope of the conspiracy). . . .
> On the other side of the ledger, as the videotaped conversation in the car demonstrated, the defendant had a predisposition to sell crack and had sold it before. However, the FBI did not know about any prior sales of crack by the defendant, or that the defendant had a reputation of selling

-13-

crack.  It only knew some of his friends sold crack. . . .

On balance, I conclude that the defendant has not proven extreme and outrageous conduct, largely because of the defendant's predisposition. . . .

(capitalization omitted.)[7]

## III.

Sentencing factor manipulation takes place "where government agents have improperly enlarged the scope or scale of [a] crime." Montoya, 62 F.3d at 3.  Such claims may arise where the government employs undercover agents in sting operations. United States v. Barbour, 393 F.3d 82, 86 (1st Cir. 2004).  We have recognized the court's power to impose a sentence below the statutory mandatory minimum as an equitable remedy for sentencing factor manipulation by the government. United States v. Capelton, 350 F.3d 231, 246 (1st Cir. 2003).  Because, however, "[b]y definition, there is an element of manipulation in any sting operation," United States v. Connell, 960 F.2d 191, 194 (1st Cir. 1992), we have stressed that this form of relief for sentencing factor manipulation is reserved for only "the extreme and unusual case," Montoya, 62 F.3d at 4.

---

[7]As it had during sentencing, the court indicated in its statement of reasons that if the Guidelines were upheld as constitutional, it would consider granting a downward departure from the applicable GSR based on the government's misconduct on remand.

-14-

The defendant bears the burden of establishing sentencing factor manipulation by a preponderance of the evidence.  United States v. Gibbens, 25 F.3d 28, 32 (1st Cir. 1994).  The district court found that burden met when it determined that the FBI agent "basically admitted that [the agents were] trying to get a higher sentence," and that this purpose was not "a legitimate law enforcement goal."

"A determination as to whether improper manipulation exists is ordinarily a factbound determination subject to clear-error review."  Id. at 30.  Having withdrawn its appeal, the government does not challenge the court's factual determination that the government harbored an improper motive of exposing Fontes to a higher sentence when agents instructed the informant to deviate from his usual practice and purchase crack rather than powder cocaine from Fontes.  Nor does Fontes dispute the court's determination, based on his statements and actions at the time of the January 3, 2003 drug deal, that he was predisposed to deal crack cocaine.  Fontes contests only the district court's ultimate conclusion, based on its findings regarding the government's misconduct and Fontes's willingness to engage in the crime when given the opportunity, that the government's actions did not amount to the "extreme and outrageous" conduct required to authorize a sentence below the statutory mandatory minimum.  "Because manipulation is largely a fact-bound inquiry, even the district

-15-

court's ultimate judgment whether the government's conduct is outrageous or intolerable is not lightly to be disregarded." Montoya, 62 F.3d at 4. Fontes thus carries a heavy burden on appeal.

Fontes first urges us to hold that once the district court found that the government agents engaged in sentencing factor manipulation because of their improper motive to increase Fontes's sentence, the district court was compelled to find that the government's misconduct was egregious enough to authorize a sentence below the statutory mandatory minimum. "Because of the diversity of circumstances, we have declined to create detailed rules as to what is or is not undue manipulation." Id. Instead, such claims "must be approached on a case-by-case basis, albeit with due regard for the potential dangers of sentencing factor manipulation." Gibbens, 25 F.3d at 31. Indeed, we have previously upheld the denial of a sentencing factor manipulation claim, "even assuming that the agents' motives were mixed and not of crystalline purity," where the defendant was otherwise "legitimately targeted and the sting objectively reasonable in extent." United States v. Egemonye, 62 F.3d 425, 428 (1st Cir. 1995). We therefore decline to adopt the per se rule Fontes advocates.

Fontes next contends that the district court erred in considering evidence of his manifest willingness to sell crack to the informant that was not available to the government at the time

-16-

that it designed the sting operation, and in concluding that this evidence of his predisposition, captured on tape as the drug deal unfolded, precluded a finding of sentencing factor manipulation "extreme and outrageous" enough to warrant a sentence below the statutory mandatory minimum.[8]  As Fontes points out, every defendant raising a sentencing factor claim has necessarily shown at least some willingness to take the bait.  In Gibbens, we did observe that a defendant's predisposition to commit an improperly enlarged crime is "of modest relevance" to a finding of sentencing factor manipulation.  25 F.3d at 31.  "When an accusation of sentencing factor manipulation surfaces, the judicial gaze should, in the usual case, focus primarily -- though not necessarily exclusively -- on the government's conduct and motives."  Id.; Montoya, 62 F.3d at 4 ("most important" factor "is likely to be the conduct of the government, including the reasons why its agents enlarged or prolonged the criminal conduct in question").  By treating his predisposition to sell crack as a bar to a conclusion that the government's misconduct was "extreme and outrageous," Fontes argues, the court ignored these directives to focus on the government's -- as distinct from Fontes's -- misconduct.

We have never stated that a court is precluded from weighing a defendant's predisposition when evaluating the degree to

---

[8]As we have discussed, Fontes does not dispute the court's determination that he was predisposed to sell crack cocaine.

-17-

which the government has engaged in sentencing factor manipulation. "By their nature, sting operations are designed to tempt the criminally inclined, and a well-constructed sting is often sculpted to test the limits of the target's criminal inclinations." Id. at 196; see also Egemonye, 62 F.3d at 427 ("Government agents are not limited to replicating a suspect's largest unsolicited crime.") Accordingly, we have noted, "a defendant's predisposition, or the lack thereof, may have evidentiary significance in the assessment of the government's motives and conduct. Moreover, one can imagine different species of sentencing factor manipulation, in some of which predisposition may be of greater relevance." Gibbens, 25 F.3d at 31 n.3. In particular, because a sentencing factor manipulation claim may turn on whether government agents "overb[ore] the will of a person predisposed only to committing a lesser crime," Connell, 960 F.2d at 196, we have recognized that some assessment of a defendant's response to an invitation to crime may be warranted, see, e.g., Egemonye, 62 F.3d at 427 (finding "no indication that [the defendant] was coerced or pressured" where defendant accepted offered sale of unprecedented quantity of stolen credit cards).

The court's consideration of Fontes's predisposition as evidenced during the sting operation did not displace the central role of the government's improper motive in the court's analysis. To the contrary, the court declared repeatedly in no uncertain

terms, based solely on the government's conduct and the FBI agent's candid admission, that the government acted improperly when it directed the informant to purchase crack in order to increase Fontes's sentencing exposure. In making this determination, the court squarely focused on the government's conduct and motives at the time it structured the sting operation, probing its reasons for structuring a deal for crack instead of powder cocaine. In that context, the court considered the government's lack of specific information, in the FBI agent's words, about "whether or not Mr. Fontes would sell that product," as well as the fact that Fontes's "track record with this particular informant was all powder and [Fontes] thought [the drug the informant sought] was powder."[9]

Having made the determination that the government's conduct was "wrong and troubling" and that it would "tak[e] it into account in where I'm going to sentence [Fontes]," the court properly inquired further to determine the degree to which the

_____

[9]Although the court found that the government knew some of Fontes's associates sold crack, it explicitly distinguished Fontes's case from that of United States v. Terry, 240 F.3d 65, 71 (1st Cir. 2001), in which we upheld a court's denial of a claim of sentencing factor manipulation, stating that "[t]he government, when investigating the business of a drug dealer who by reputation sells both crack and powder cocaine, is under no obligation to buy only that product or quantity which would produce the smallest sentence for the defendant" (emphasis added). We reiterate that because the government has withdrawn its appeal, we need not express a view on the correctness of the court's determination that the government acted with an improper motive by seeking a higher sentence without specific evidence of actual or rumored crack deals involving Fontes himself.

government engaged in misconduct -- that is, whether the government's misconduct was sufficiently egregious to warrant a sentence below the statutory mandatory minimum.  See Montoya, 62 F.3d at 4 ("in order to require a reduction" below the statutory mandatory minimum, defendant must show that the government's conduct was "carried to such a degree that [it] must be viewed as 'extraordinary misconduct'") (quoting Gibbens, 25 F.3d at 31).

In order to discern whether the government applied "outrageous or intolerable pressure" on Fontes to supply a different type of cocaine than he was prepared to sell, Montoya, 62 F.3d at 4, the court reasonably considered the limits of Fontes's own predilection for trafficking in crack cocaine as demonstrated during the January 3, 2003 drug deal itself.  As the transcript of the taped controlled purchase reveals, when Fontes entered the car, he stated, unprompted, that he had just provided cocaine to someone else and that he had helped that person cook it into crack.  Later, when the informant protested that he needed cocaine in the form of crack rather than powder, Fontes, far from refusing to go through with the deal, quickly accommodated the informant's needs.  While Fontes expressed surprise and disappointment at the unexpected request, he displayed no discomfort with the quantity or type of cocaine requested by the informant.  This evidence of Fontes's predisposition to sell crack was, in the court's words, "devastating" to his claim of sentencing factor manipulation.

-20-

Based on what it found to be "very strong evidence" at the moment of truth that Fontes was ready, willing, and able to accommodate the informant's need to purchase crack upon request, the court supportably concluded that the government, while motivated at least in part by an improper desire to increase Fontes's sentencing exposure, exerted no undue pressure or coercion sufficient to "overbear[] the will of a person predisposed only to committing a lesser crime." Connell, 960 F.2d at 196. The court's conclusion that the government's conduct was not, in its words, "extreme and outrageous" enough to warrant a sentence below the statutory mandatory minimum "is not lightly to be disregarded." Montoya, 62 F.3d at 4. We apply that principle here. Accordingly, Fontes's sentence is **affirmed**.

**So ordered**.