**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee*,

v.

ANTHONY BOYKIN,
  *Defendant-Appellant*.

No. 13-10248

D.C. No.
2:07-cr-00141-WBS-1

OPINION

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, Senior District Judge, Presiding

Argued and Submitted
November 17, 2014—San Francisco, California

Filed May 18, 2015

Before: Michael Daly Hawkins and Johnnie B. Rawlinson,
Circuit Judges, and Barbara M. G. Lynn, District Judge.[*]

Opinion by Judge Lynn

---

[*] The Honorable Barbara M. G. Lynn, United States District Judge for
the Northern District of Texas, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed a conviction for one count of distribution of methamphetamine (Count 6) and the sentence imposed for five counts of distribution of methamphetamine, one count of distribution of cocaine, and one count of conspiracy to distribute.

The panel held that there was sufficient evidence to support the conviction on Count 6, as to which the jury was instructed on an aiding and abetting theory of liability. The panel explained that a rational jury could have found that the defendant and his brother collaborated on the drug transaction at issue, considering all of the evidence, including the conspiracy and the fact that the defendant and his brother collaborated on multiple drug transactions in person and by phone.

The panel found deeply troubling the conduct of the involved law enforcement agencies, but held that the improprieties do not warrant reversal of the district court's denial of a downward departure for sentencing manipulation. The panel held that it was reasonable for law enforcement to extend the investigation to build a stronger case with more controlled purchases by a more credible confidential source, and that the existence of an ambiguous FBI memo did not require the district court to conclude that the investigators

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

extended the investigation solely to enhance the defendant's sentence.

The panel found it was not an abuse of discretion for the district court to find the defendant's criminal history to be accurately stated, and held that the district court did not err in applying an enhancement for firearm possession. The panel rejected the defendant's argument that the drug quantity attributed to him was unforeseeable.

Because the defendant may move the district court for relief under Sentencing Guidelines Amendment 782, the panel declined to remand the case on those grounds.

## COUNSEL

Joseph J. Wiseman (argued), Wiseman Law Group, P.C., Davis, California, for Defendant-Appellant.

Benjamin B. Wagner, United States Attorney, Camil A. Skipper, Appellate Chief, Heiko P. Coppola (argued), Assistant United States Attorney, Sacramento, California, for Plaintiff-Appellee.

**OPINION**

LYNN, District Judge:

This appeal arises from a series of controlled drug purchases conducted over a period of nearly seven months during 2006 and 2007.

At trial, the defendant, Anthony Boykin ("Boykin"), was convicted on five counts of distribution of methamphetamine, one count of distribution of cocaine, and one count of conspiracy to distribute. His appeal challenges the sufficiency of the evidence on Count Six, one of the counts for distribution of methamphetamine. He also challenges his sentence, arguing that the district court erred in (1) not departing downward for sentencing manipulation; (2) not finding his criminal history to be overstated; and (3) not sustaining objections to certain sentencing enhancements.

The Court finds the evidence was sufficient to convict Boykin on Count Six. While the Court finds deeply troubling the conduct of the involved law enforcement agencies, the improprieties do not warrant reversal due to sentencing manipulation. Finally, the Court finds it was not an abuse of discretion for the district court to find the defendant's criminal history to be accurately stated, nor for it to apply the enhancements challenged. Therefore, we affirm the district court's rulings on each of the grounds raised on appeal.

## FACTUAL AND PROCEDURAL BAGKROUND

### I.  The Controlled Purchases

Boykin and his brother, Patrick, sold methamphetamine and cocaine to three different confidential sources from August 29, 2006 to March 26, 2007.  These controlled purchases usually took place at 251 Wilbur Avenue, or at a nearby store, Wilbur Market.[1]  The investigation of the Boykins was conducted by a Narcotics Enforcement Team, NET-5, which was composed of local and state law enforcement representatives and supervised by the California Department of Justice, Bureau of Narcotic Enforcement. NET-5 also worked with federal law enforcement agencies, including the FBI.

On August 29, 2006, the government directed a confidential source, Rachel Rios, to call Boykin to purchase two ounces of methamphetamine.  Boykin instructed Rios to go to an apartment complex, where she met with an unidentified female while he watched the transaction from a second-story window.  The government later deactivated Rios as a source when it discovered that she was still selling methamphetamine, and as a result, the government recruited a new confidential source, Crystal Housley.[2]

---

[1] The Boykins and others in the neighborhood would frequently "hang out" and congregate at 251 Wilbur Avenue, a residence owned by the Boykins' mother.

[2] The record is inconsistent with respect to the spelling of Housley's name.  Because the trial transcript spells her name as "Housley," the Court will do the same.

Housley participated in two controlled purchases involving Boykin, on September 13, 2006, and September 28, 2006. In the first purchase, Housley called Boykin and asked to purchase cocaine. He directed her to meet with Patrick, who completed the transaction. In the second purchase, Housley called Boykin and asked to buy methamphetamine. Boykin met her at Wilbur Market and completed the transaction.

On or about October 27, 2006, Housley was arrested on federal fraud charges. However, she was not deactivated as a source until December 23, 2006, after she pled guilty to fraud. Housley had been handled by Detective Thomas Oakes, a narcotics detective with the Yuba County Sheriff's Department and a member of NET-5, with whom she had a close relationship. At Boykin's trial, Detective Oakes testified that upon learning of Housley's pending federal fraud charges, he immediately delivered her to federal agents, deactivated her as an informant, and paid no further monies to her after she was arrested. This testimony was inaccurate, and ultimately led to a stipulation that, in fact, Housley continued to work as an informant for almost two months after her arrest, and she was paid during that time period.

Detective Oakes' brother, Jonathan "Johnny" Oakes, was a friend or associate of the Boykins. Johnny was known to "hang out and be in contact" with them, and Detective Oakes testified that Johnny and Boykin played pool together.[3]

---

[3] The details of the relationship between Johnny Oakes and the Boykins is not entirely clear from the record, but the testimony of Detective Oakes prompted Judge Shubb to remark, "I thought only in the movies did police officers investigate cases where their brothers were personal friends of the person they were investigating." Judge Shubb found the relationship so

Despite the conflict arising from the relationship of Johnny to the Boykins, Detective Oakes continued to participate in the investigation, although the extent of his participation was disputed.[4]

After Housley was deactivated, the government recruited a third confidential source, Robert Walton, who conducted controlled purchases from the Boykins on February 3, 2007, February 9, 2007, March 16, 2007, and March 26, 2007. Boykin often facilitated the transaction over the phone, or he directly passed the drugs to Patrick, who delivered them to Walton.

On appeal, Boykin challenges the sufficiency of the evidence only for the drug transaction of February 9, 2007. Patrick arranged for that transaction to take place at 251 Wilbur Avenue. Both brothers were outside the residence when Walton arrived. Walton left with Patrick to pick up a scale and met an unidentified Hispanic male at Wilbur Market to obtain the drugs, after which they returned to 251 Wilbur Avenue. Walton remained in Patrick's truck while Patrick went in the house. Boykin had also left 251 Wilbur

---

"remarkable" that he thought it would be wrong to not let the jury hear about Johnny Oakes' relationship with the Boykins.

[4] Detective Oakes testified that his brother's relationship with the Boykins prompted his supervisors to limit his involvement in the investigation by assigning him to manage informant Housley. Detective Oakes acknowledged that he was present for the two drug transactions with Housley. He could not recall whether he was present or part of the surveillance team for transactions involving Walton. Detective Oakes described his role in the case as "very limited," which the Court construes to mean that his role was more limited than at least some other members of NET-5 working on the Boykin case.

Avenue, but he returned after Patrick and Walton did. An unidentified white male also entered the residence while Walton sat in Patrick's truck. Officers conducting surveillance testified that Patrick made several trips in and out of 251 Wilbur Avenue before completing the transaction with Walton. The government also introduced evidence that several phone calls were made between Patrick and Boykin during the relevant time period. The evidence showed that Patrick began arranging for the drug transaction at 11:58 a.m., and it took place at 2:11 p.m. Meanwhile, Boykin called Patrick at 12:35 p.m., and Patrick called Boykin at 1:51 p.m. and 3:04 p.m.

On March 29, 2007, law enforcement officials executed search warrants at 251 Wilbur Avenue, Patrick's residence, and Boykin's residence. At Boykin's residence, agents seized $27,000 in cash, scales with drug residue, and cellular telephones used during the controlled purchases. At 251 Wilbur Avenue, agents found a small amount of methamphetamine with packaging material, two scales, and several guns, including a sawed-off shotgun with Boykin's fingerprints.

## II. Proceedings in the District Court

Boykin and Patrick were charged by indictment with one count of conspiracy to distribute and possess with intent to distribute methamphetamine and cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1); six counts of distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); and one count of distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1). Patrick pled guilty to the conspiracy count, but Boykin proceeded to a jury trial. On March 4, 2011, the jury returned its verdict, finding Boykin guilty of the conspiracy

count and six counts of distribution, and acquitting him of one count of distribution of methamphetamine.

The Presentence Report (PSR) recommended a base offense level of 34, plus a two-level increase under United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1(b)(1) for possession of a firearm, resulting in an Adjusted Offense Level of 36. The PSR recommended 262 months of incarceration, which was at the low end of the advisory guideline range, after taking into account Boykin's criminal history level of IV.

The district court gave Boykin a two-level reduction for acceptance of responsibility, which placed the Adjusted Offense Level at 34. Finding that Boykin's criminal history was accurately stated in the PSR, the court concluded that the guideline range was 210 to 262 months, and sentenced Boykin to 210 months to avoid any sentencing disparity with Patrick, who also received a sentence of 210 months.

Boykin filed a timely notice of appeal, challenging the sufficiency of the evidence on Count Six and arguing that the district court erred by not granting a downward departure for sentencing manipulation, and by not finding his criminal history to be overstated. After initial briefing was complete, Boykin filed a pro se supplemental brief, arguing the district court committed plain error by applying a two-level enhancement for possession of a firearm, and by failing to conduct an individualized analysis of his participation in the conspiracy. On September 24, 2014, Boykin's counsel sent a letter to the Court, requesting remand in light of Amendment 782 to the U.S. Sentencing Guidelines.

## ANALYSIS

### I.   Sufficiency of the Evidence

The court reviews de novo a challenge to the sufficiency of the evidence.  *United States v. Antonakeas*, 255 F.3d 714, 723 (9th Cir. 2001).  "Viewing the evidence in the light most favorable to the government, [the Court] must determine whether any rational jury could have found [the defendant] guilty of each element of the crime beyond a reasonable doubt."  *United States v. Esquivel-Ortega*, 484 F.3d 1221, 1224 (9th Cir. 2007) (citation omitted).  The trier of fact has the responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

A conviction for possession with intent to distribute may be based on one of three legal theories: (1) co-conspirator liability; (2) aiding and abetting; and (3) exercising dominion and control over the contraband.  *United States v. Sanchez-Mata*, 925 F.2d 1166, 1168 (9th Cir. 1991) (citations omitted).

Boykin argues the government failed to establish that he actually or constructively possessed the methamphetamine on February 9, 2007.  However, because the jury was instructed on an aiding and abetting theory of liability, it was not necessary for the government to show actual or constructive possession, or that Boykin actually sold the drugs.  *See United States v. Gillock*, 886 F.2d 220, 222 (9th Cir. 1989). Rather, it was enough to show that Boykin associated with the criminal venture, participated in it, and sought, by his actions, to make it a success. *See id.*  Circumstantial evidence

may support a conviction for aiding and abetting. *United States v. Corona-Verbera*, 509 F.3d 1105, 1119 (9th Cir. 2007).

Here, there was sufficient evidence for a rational jury to find that Boykin aided and abetted Patrick's distribution of methamphetamine on February 9, 2007. Patrick arranged the transaction and told Walton to come to 251 Wilbur Avenue. Both Patrick and Boykin were there when Walton arrived. After leaving briefly, Patrick and Walton returned to 251 Wilbur Avenue. Boykin, who had also left, returned to 251 Wilbur Avenue as Patrick was making trips back and forth between the residence and Patrick's truck, where Walton remained and where the drug transaction ultimately took place. The government's evidence also showed three phone calls between Boykin and Patrick on February 9, 2007, two of which were close in time to the transaction.[5] Finally, law enforcement found drug paraphernalia, guns, and money when they executed search warrants at Boykin's residence and 251 Wilbur Avenue. *See Gillock*, 886 F.2d at 222 (holding an intent to distribute could be inferred from the gun found in the defendant's closet and the large quantities of lab

---

[5] Boykin correctly notes that the first call was *from* Boykin *to* Patrick. However, the second call was *from* Patrick *to* Boykin. The Court is bound to respect that the jury has "exclusive province . . . to . . . resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *See Gillock*, 886 F.2d at 222. This rule applies to these calls, and also applies to Boykin's argument that either the unidentified white male who entered the residence around the same time he did, or the unidentified Hispanic male with whom Patrick and Walton met at Wilbur Market, could have supplied the methamphetamine. Those facts were for the jury to decide, and even if construed as the defendant contends, they do not necessarily mean Boykin did not aid and abet the transaction.

equipment and methamphetamine found in the residences of the defendant's associates).

Considering all of the evidence, including the conspiracy and the fact that Boykin and Patrick collaborated on multiple drug transactions, in person and by phone, a rational jury could have found that Boykin and Patrick collaborated on the drug transaction of February 9, 2007. *See United States v. Smith*, 832 F.2d 1167, 1172 (9th Cir. 1987) ("Hence, this is not a case involving nothing more than a simple, isolated purchase."). For the aforementioned reasons, we affirm the jury's conviction on the February 9, 2007 count for distribution of methamphetamine.

## II. Sentencing

### A. Sentencing Manipulation

The Ninth Circuit has not always been careful in recognizing the distinction between "sentencing entrapment" and "sentencing manipulation." *See, e.g.*, *United States v. Si*, 343 F.3d 1116, 1128 (9th Cir. 2003) ("the result of sentencing factor manipulation, also known as sentencing entrapment"); *United States v. Riewe*, 165 F.3d 727, 729 (9th Cir. 1999); *United States v. Staufer*, 38 F.3d 1103, 1106 (9th Cir. 1994) (describing "sentencing entrapment" as "sentence factor manipulation"). When a defendant can show he was predisposed to commit a minor or lesser offense, but was entrapped to commit a greater offense, subject to greater punishment, he may be eligible for a downward departure or variance for "sentencing entrapment." *United States v. Mejia*, 559 F.3d 1113, 1118 (9th Cir. 2009). In contrast, "sentencing manipulation" occurs when the government increases a defendant's guideline sentence by conducting a lengthy

investigation which increases the number of drug transactions and quantities for which the defendant is responsible. *United States v. Torres*, 563 F.3d 731, 734 (8th Cir. 2009). In other words, what sets "sentencing entrapment" apart from "sentencing manipulation" is that, in the latter, "the judicial gaze should, in the usual case, focus primarily—though not necessarily exclusively—on the government's conduct and motives." *United States v. Fontes*, 415 F.3d 174, 181–82 (1st Cir. 2005).

To prove sentencing manipulation, a defendant must show "that the officers engaged in the later drug transactions solely to enhance his potential sentence." *Torres*, 563 F.3d at 734. Cases from other circuits have granted relief for sentencing manipulation in "only the extreme and unusual case" involving "outrageous governmental conduct." *See Fontes*, 415 F.3d at 180; *United States v. Beltran*, 571 F.3d 1013, 1018–19 (10th Cir. 2009) (explaining that, based on due process principles, sentencing manipulation "allow[s] a court to modify a sentence if considering the totality of the circumstances, 'the government's conduct is so shocking, outrageous and intolerable that it offends 'the universal sense of justice'''"). If a court finds sentencing manipulation, a downward departure should be applied to the guidelines range, "since such manipulation artificially inflates the offense level by increasing the quantity of drugs included in the relevant conduct." *Torres*, 563 F.3d at 734–35.

Although Boykin argued below that his sentence should be reduced due to sentencing entrapment, the substance of his argument and the district court's analysis indicate that Boykin mislabeled the argument. In fact, Boykin's challenge addressed the conduct of law enforcement rather than his predisposition. Given the thrust of Boykin's argument and

the lack of precision with which we have previously used the terms "sentencing entrapment" and "sentencing manipulation," we review the district court's factual findings in the sentencing phase for clear error. *See United States v. Castaneda*, 94 F.3d 592, 594 (9th Cir. 1996). "In order to reverse a district court's factual findings as clearly erroneous, we must determine that the district court's factual findings were illogical, implausible, or without support in the record." *United States v. Spangle*, 626 F.3d 488, 497 (9th Cir. 2010).

To support his sentencing manipulation argument, Boykin points to three facts that allegedly motivated law enforcement to induce further controlled purchases from the Boykins: (1) the FBI memo reviewing the progress of the investigation against Patrick, Boykin, and others, and explaining that additional drug buys would be necessary to reach the sentencing goals set by the U.S. Attorney's Office; (2) Detective Oakes' close relationship with confidential source Housley; and (3) the close relationship of Detective Oakes' brother, Johnny, to Boykin and Patrick. Boykin argues that Detective Oakes' participation in the investigation constitutes outrageous government conduct, which supports a finding of sentencing manipulation under a test employed by the Tenth Circuit. *See Beltran*, 571 F.3d at 1017–18. In the alternative, Boykin argues that he was entitled to a downward departure because law enforcement engaged in additional transactions solely to increase his sentence, urging us to follow precedent from the Eighth Circuit. *See Torres*, 563 F.3d at 734.

Regardless of the test employed, Boykin fails to demonstrate that the district court's findings were clearly erroneous. With regard to the test in *Beltran*, although the Court is deeply troubled by the participation of Detective

Oakes, the investigation fell just shy of constituting outrageous government conduct.  As a result of his unusually close relationship with informant Housley and his brother's friendship with the Boykins, Oakes clearly had multiple incentives to prolong the investigation.[6]  Furthering this perception, Oakes gave erroneous testimony at trial regarding his response to learning of Housley's arrest on fraud charges, requiring a stipulation at trial between the parties that Oakes in fact continued working with, and paying, Housley after the arrest.  However, despite Oakes' conflict of interest, because his role was limited and he was being supervised, rather than directing the investigation, his conduct was "wrong and troubling," but not so "extreme and outrageous" as to warrant a downward departure for sentencing manipulation.  *See Fontes*, 415 F.3d at 183.[7]

With respect to the *Torres* test, Boykin asks the Court to hold that it is improper for the government to continue an

---

[6] Boykin also notes that Detective Oakes arranged for NET-5 to pay for Housley's apartment and utilities.  Detective Oakes also gave her his home phone number, which he admitted was unusual.  However, NET-5 apparently had a meeting to approve these payments, and Detective Oakes testified that agents kept a close eye on Housley because NET-5 paid for her apartment.

[7] The investigation of the Boykins was not an operation "created and staged" by law enforcement, nor was law enforcement "trolling for targets" based on economic and social conditions in the community.  *See United States v. Black*, 733 F.3d 294, 303 (9th Cir. 2013).  Rather, in investigating the Boykins, law enforcement was infiltrating a preexisting criminal organization.  *See id.* at 302.  ("It is not outrageous . . . to approach individuals who are already involved in or contemplating a criminal act, or to provide necessary items to a conspiracy.").  Therefore, the due process concerns raised and rejected in *Black* are not implicated in this case.

investigation merely to enhance the defendant's sentence, and that mitigating a defendant's sentence is a fitting tool to deter such improper investigations. This Court has previously held that a district court may consider the full amount of drugs involved when law enforcement arranges multiple controlled drug purchases for legitimate investigatory reasons. *United States v. Baker*, 63 F.3d 1478, 1500 (9th Cir. 1995). Thus, the issue here is whether legitimate reasons existed for the investigation or whether it was solely intended to increase Boykin's sentence.

In *Baker*, this Court rejected the defendant's argument that his conviction should be reversed because the government stretched out its investigation to increase the drug quantity and potential charges against the defendant after it had sufficient evidence to indict. *Id.* The Court "decline[d] to adopt a rule that, in effect, would find 'sentencing manipulation' whenever the government, even though it has enough evidence to indict, opts instead to wait in favor of continuing its investigation" because "[s]uch a rule 'would unnecessarily and unfairly restrict the discretion and judgment of investigators and prosecutors,'" and "[p]olice . . . must be given leeway to probe the depth and extent of a criminal enterprise, to determine whether coconspirators exist, and to trace . . . deeper into the distribution hierarchy." *Id.* (internal quotations and citations omitted). Finally, the Court emphasized that because "the government bears the burden of proving its case beyond a reasonable doubt, it must be permitted to exercise its own judgment in determining at what point in an investigation enough evidence has been obtained." *Id.*

Here, there was evidence that the government extended its investigation to build a stronger case against Boykin. Of

particular concern was that the government's first two confidential sources—Rios and Housley—were both convicted of serious offenses during the period they were acting as confidential sources against the Boykins. Therefore, it was reasonable for law enforcement to extend the investigation with more controlled purchases by a more credible confidential source. This is precisely what law enforcement did in having Walton make controlled purchases in February and March 2007.

Further, the existence of the FBI memo did not require the district court to conclude that the investigators extended the investigation solely to enhance Boykin's potential sentence. Although the memo specifically recommended drug volumes to establish charges, its text is too ambiguous to establish that the agents' sole intent was to enhance Boykin's sentence, because it discusses several defendants earlier in the text and the phrase in question does not clearly refer to Boykin:

> Additional drug buys from several of the captioned subjects will be necessary to reach the preferred thresholds established by the United States Attorney's Office in the Eastern District of California. It is recommended by their office that 50 grams or more of methamphetamine or 500 grams or more of a cocaine powder be purchased from one individual to secure a five (5) year mandatory minimum sentence. This case continues.

In fact, on January 31, 2007, when the memo was circulated, Boykin had *already* participated in controlled purchases involving over 50 grams of methamphetamine, which was the amount described in the memo as necessary to

meet the five-year statutory mandatory minimum sentence.[8] Thus, the district court did not clearly err by not finding the FBI memo to be a basis for a charge of sentencing manipulation.

## B. Criminal History

Boykin also argues the district court erred by failing to look at the underlying facts of his criminal history when deciding if it was overstated.

The Court reviews de novo a district court's interpretation of sentencing guidelines, and the application of the sentencing guidelines is reviewed for abuse of discretion. *United States v. Hernandez-Guerrero*, 633 F.3d 933, 935 (9th Cir. 2011). "A sentencing court is permitted under U.S.S.G. § 4A1.3 to depart from a recommended sentence if it believes that a defendant's criminal history category significantly over-represents the seriousness of his criminal record or the likelihood that he will commit further crimes." *United States v. Govan*, 152 F.3d 1088, 1094 (9th Cir. 1998). Furthermore, the district court retains discretion to depart downward from the guidelines should it find "mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." *United States v. Brown*, 985 F.2d 478, 481 (9th Cir. 1993)

---

[8] On August 29, 2006, Boykin distributed two ounces of methamphetamine. On September 13, 2006, Boykin distributed one-eighth of an ounce of cocaine. On September 28, 2006, Boykin distributed eight ounces of methamphetamine. One ounce is equal to approximately 28.35 grams, which means Boykin had met the 50 gram threshold well before the FBI memo was circulated.

(quoting 18 U.S.C. § 3553(b)) (alteration omitted). The district court may consider "without limitation, *any information* concerning the background, character and conduct of the defendant, unless otherwise prohibited [by the guidelines or other law]." *Id.* (citing U.S.S.G. § 1B1.4).

At the sentencing hearing, Boykin gave a detailed explanation of the facts and circumstances surrounding his convictions for vandalism and a loud noise disturbance, and argued that the facts underlying those offenses were not sufficiently egregious to warrant two additional points being counted toward his criminal history category. The district court responded that "you get on a slippery slope when you start trying to look at the underlying facts and look beyond the judgment in determining the criminal history," and stated that the "criminal history [was] calculated properly," and that it did not "believe that the criminal-history category [overstated] the seriousness of the criminal history." This ruling was not an abuse of discretion, and the trial court was not required to give a further explanation.

Boykin further objects to the addition of two criminal history points for a 2001 misdemeanor conviction for disturbance of the peace, which Boykin argues was part of a plea deal in which the prosecutor found that the domestic abuse victim's allegations were not credible. He also objects to the addition of one point for a 2005 misdemeanor conviction for vandalism, in which Boykin arrived at a burning apartment allegedly believing his children were inside, discovered his children were fine, and then became obstructive when officers allegedly treated him contemptuously.

It was not an abuse of discretion for the court to determine these incidents were properly calculated in determining Boykin's criminal history.

## C.  Weapon and Coconspirator Enhancements

Finally, Boykin argues that the district court erred by applying a two-level enhancement for firearm possession. This Court reviews for clear error the district court's factual determination that the firearm enhancement in U.S.S.G. § 2D1.1(b)(1) applies. *United States v. Kelso*, 942 F.2d 680, 681 (9th Cir. 1991).

The defendant argues the district court never connected him to the handgun.  However, Boykin misinterprets both the enhancement and his burden.   The two-level sentencing adjustment is appropriate "unless it is clearly improbable that the weapon was connected with the offense."  U.S.S.G. § 2D1.1 n. 3 (2010).   The government "must prove possession by a preponderance of the evidence before the court can apply the two-level increase under § 2D1.1(b)(1)." *United States v. Cazares*, 121 F.3d 1241, 1244 (9th Cir. 1997) (quoting *United States v. Mergerson*, 4 F.3d 337, 350 (5th Cir. 1993)).

This Court has defined "possession" broadly.  *United States v. Pitts*, 6 F.3d 1366, 1372 (9th Cir. 1993).  "To demonstrate constructive possession the government must prove 'a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over the [contraband].'" *Kelso*, 942 F.2d at 682  (quoting *United States v. Disla*, 805 F.2d 1340, 1350 (9th Cir. 1986)).  Where a defendant is convicted of conspiracy, the firearm enhancement can be

based on all of the offense conduct, not just the crime of conviction. *United States v. Willard*, 919 F.2d 606, 610 (9th Cir. 1990), *cert. denied*, 502 U.S. 872 (1991).

Here, agents recovered several firearms from the residence at 251 Wilbur Avenue, including a sawed-off shotgun with Boykin's fingerprints. The evidence showed Boykin engaged in numerous drug transactions at 251 Wilbur Avenue. Thus, the court did not clearly err by finding Boykin possessed a weapon connected with the offense. *See Pitts*, 6 F.3d at 1372.

Boykin also argues the district court failed to make a proper individualized assessment of his relevant conduct in the conspiracy. He argues his tenuous connection with the transaction of February 9, 2007 made that drug quantity unforeseeable to him.

For reasons already discussed, the evidence was sufficient to convict Boykin of aiding and abetting the transaction of February 9, 2007. Therefore, the drug quantity attributed to him was foreseeable. *See Willard*, 919 F.2d at 610.

For the foregoing reasons, we affirm the sentence imposed by the district court.[9]

**AFFIRMED.**

---

[9] Because Boykin may move the district court for relief under Amendment 782 to the Guidelines, the Court declines to remand the case on those grounds. *See* 18 U.S.C. § 3582(c)(2).